**KODIAK SEAFOOD PROCESSORS ASSOCIATION, Appellant, Cross–Appellee,**

v.

**STATE of Alaska, Commissioner, Alaska Department of Fish and Game, Appellee/Cross–Appellant.**

No. S–5987/6037.

Supreme Court of Alaska.

Aug. 11, 1995.

Gregory F. Cook, Douglas, for appellant/cross-appellee.

Martin M. Weinstein, Asst. Atty. Gen. and Bruce M. Botelho, Atty. Gen., Juneau, for appellee/cross-appellant.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

On February 26, 1993, the Commissioner of the Alaska Department of Fish and Game (Commissioner) issued an "Exploratory Scallop Fishing Permit" (Permit) that allowed Mark Kandianis to dredge for scallops in an area closed to scallop fishing. The Kodiak Seafood Processors Association (KSPA) sought a temporary restraining order to stop the dredging and a declaratory judgment holding that the Commissioner's action improperly allowed commercial scallop fishing in an area the Alaska Board of Fisheries closed to commercial fishing.[1] Although ADF & G revoked the Permit before trial, KSPA requested summary judgment on its motion for declaratory judgment. The supe-rior court denied KSPA's motion and granted the State's cross-motion for summary judgment. KSPA appeals. We affirm.

## II. FACTS AND PROCEEDINGS

This dispute began when the Alaska Department of Fish and Game issued an "Exploratory Scallop Fishing Permit" to the F/V Provider, a scallop fishing vessel owned and operated by Mark Kandianis. The Permit allowed Kandianis to conduct "exploratory fishing ... in waters south of Kodiak Island currently closed to fishing for weathervane scallops." The Permit required Kandianis to pay to have a State observing biologist on board while fishing. The biologist was to collect data from the exploratory fishing operation. The Department would compile the data and make it public. The Permit gave the ADF & G Area Management Biologist power to terminate the Permit "when it is in the best interest of the State of Alaska." The Permit stated that it was granted "under the commissioners [sic] authority in Alaska Statute 16.05.050."[2] The Permit allowed Kandianis to keep and sell the scallops to be collected on the trip.

The Permit was controversial because of the potential injury and death to juvenile and adult crabs and other damage to the ocean floor a scallop dredge might cause. The waters in which the Permit allowed Kandianis to fish had been closed since 1969 to scallop dredging due to the high by-catch of King and Tanner Crab and the high mortality rate of crab caught in the dredge.[3] 5 Alaska Administrative Code (AAC) 38.425.

---

1. Although the Alaska Board of Fisheries is part of the Alaska Department of Fish and Game (ADF & G), it does not have administrative, budgeting, or fiscal powers. AS 16.05.241. In this case, when we discuss actions taken by ADF & G we are referring to actions taken by the Commissioner of ADF & G, or by employees of the Department acting under his authority.

2. AS 16.05.050 provides in pertinent part:
 *Powers and duties of commissioner.* The commissioner has, but not by way of limitation, the following powers and duties:
 . . . .
 (5) to collect, classify, and disseminate statistics, data and information that, in the commissioner's discretion, will tend to promote the purposes of this title except AS 16.51 and AS 16.52;

 . . . .
 (11) not later than January 31 of each year, to provide to the commissioner of revenue the names of those fish and shellfish species that the commissioner of fish and game designates as developing commercial fish species for that calendar year ...
 (12) to initiate or conduct research necessary or advisable to carry out the purposes of this title ...
 . . . .
 (15) to sell fish caught during commercial fisheries test fishing operations....

3. In 1976 we had occasion to describe the effect a scallop dredge has on the ocean floor. *State v. Sieminski,* 556 P.2d 929 (Alaska 1976). We stated: "There was considerable testimony to the effect that this mode of fishing was highly de-

The manner in which the Permit was issued also upset the Kodiak fishing community. Kandianis requested the Permit on February 26. The Permit was issued and made effective that day. Kandianis set out that afternoon. Aside from the Permit itself, no agency record discusses issuing the Permit, nor was there any public announcement that the Permit had been issued. ADF & G admits that it failed to follow the procedures mandated by the state procurement code.

On March 2 the Kodiak Seafood Processors Association, an association of the managers of eight seafood processing companies in Kodiak, filed suit in superior court seeking to enjoin the dredging in closed waters. It asserted that the Permit was issued contrary to law in a "back-door, 'sweetheart' deal."

ADF & G describes the circumstances surrounding issuance of the Permit quite differently. It saw the Permit as a necessary part of its development of a scallop fishery management plan. Larry Nicholson, Westward Regional Supervisor for the Commercial Fisheries Division of the Department, stated that the Department had been considering conducting research in the closed area because recent scallop and crab by-catch data were unavailable. He stated that the Permit was issued to Kandianis because Kandianis happened to be available to do the work and that the decision to issue the Permit was rendered quickly because the Department had a limited budget and wanted to issue the Permit before the office got "mired in work relating to the upcoming salmon and herring seasons." He stated that the research areas were limited to six percent of the total closed waters and were selected because they were not located in areas known to be a critical crab habitat or crab nursery. According to Nicholson, there was nothing unusual about contracting with a private fisher to conduct a test fishery aside from the State's failure to

follow the usual procurement process. He stated that in the future the State would either conduct the research itself or follow the procurement code.

The F/V Provider began its voyage February 26, the afternoon the Permit was issued. On board were the Captain, Kandianis; a full crew for scallop fishing; a University of Alaska observer trainer invited by Kandianis; and an ADF & G biologist, the State observer required by the Permit. While the crew of the Provider fished around the clock, the two biologists sampled part of the catch.[4] There was a significant Tanner crab by-catch problem in the Albatross Banks area. There was no commercial crab by-catch in the Chirikof area. After the voyage, the ADF & G biologist wrote an eight-page memorandum documenting the trip and the research conducted.

Many commercial fishermen were upset when news of the Permit spread. On March 2, the same day KSPA filed suit, ADF & G issued an Emergency Order that opened the closed waters to scallop fishing exclusively under Kandianis' Permit. The order was effective retroactively to February 26, the day the Permit was issued, and was to continue in effect until March 17, two days after the Permit was to expire.

On March 3, the day the State's response to Kodiak's motion for a temporary restraining order was due, and two weeks before the Permit was to expire, the State informed the superior court that "the exploratory fishery had accomplished its goals" and that the Permit had been revoked. On March 3 the superior court ruled that KSPA's request for a restraining order was moot. KSPA moved for summary judgment on its requests for declaratory and injunctive relief based on the memoranda and exhibits on file with the court at the time. The State also moved for summary judgment.

structive of the crab resource, inasmuch as a dredge would indiscriminately crush crabs and other shellfish as it gathered its catch." *Id.* at 932. The effect of a dredge does not appear to have changed in the years since we issued that opinion. The observing biologist aboard the F/V Provider noted in his report that the Tanner crab by-catch was, "22% excellent, 25% poor, and

53% dead, mostly due to crushing injuries to the carapace."

4. In the Albatross Banks area, they sampled nine of nineteen dredges. In the Chirikof area, thirty-seven of the sixty-one tows were examined for crab by-catch and three were sampled for species composition.

The trial court denied KSPA's motion for summary judgment and granted the State's cross-motion for summary judgment. The court held: the Permit was lawfully issued under the Department's authority to conduct research; the agency decision did not rise to the level of a "regulation"; the agency did not abuse its discretion in issuing the Permit; since the Permit was not a regulation and did not constitute the opening of a "commercial fishery," there was no "special privilege to take fish" that violated the Alaska Constitution; and any violation of the procurement code was moot and not likely to be repeated because the State admitted it was wrong and had pledged to follow the procurement regulations. The court also held that ADF & G's Emergency Order was illegal in this situation. However, it concluded that the State's actions did not depend on the Emergency Order because the Permit was legal under the Commissioner's broad power to conduct research.

On the State's motion for attorney's fees, the court held that KSPA was a public interest litigant and was therefore exempt from having to pay its opponent's attorney's fees. Given that finding, the court did not address KSPA's argument that the State was not a prevailing party.

### III. DISCUSSION

There are three primary issues on appeal. First, must ADF & G comply with the state's procurement code when contracting with the private sector to conduct research? Second, did the Commissioner exceed his authority by issuing the Exploratory Fishing Permit? Third, did the trial court abuse its discretion in finding KSPA to be a public interest litigant?[5]

Because the Exploratory Fishing Permit has expired, we must determine whether this appeal presents a justiciable case or controversy before addressing the merits.

**5.** KSPA also argues that the Commissioner must articulate "compelling biological circumstances that constitute a conservation emergency" before issuing an emergency order, and that Kandianis refund to the State all proceeds from the sale of the fish. We do not reach the first of these issues because the trial court ruled in KSPA's favor and the State did not appeal. Therefore there is no

### A. Mootness

Under ordinary circumstances, we will refrain from deciding questions where events have rendered the legal issue moot. *Brandon v. Dep't of Corrections*, 865 P.2d 87, 92 n. 6 (Alaska 1993) (citing *Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985)). A claim is moot if it has lost its character as a present, live controversy. *Kleven v. Yukon–Koyukuk School Dist.*, 853 P.2d 518, 523 (Alaska 1993) (citing *United States v. Geophysical Corp.*, 732 F.2d 693, 698 (9th Cir. 1984)).

Mootness is particularly important in a case seeking a declaratory judgment because there is an added risk that the party is seeking an advisory opinion. Under the Alaska Declaratory Judgment Act, "in case of an actual controversy" the court has the discretion to "declare the rights and legal relations of an interested party seeking the declaration." AS 22.10.020(g). In *Jefferson v. Asplund*, 458 P.2d 995 (Alaska 1969), we delineated the jurisdictional limitations governing the court's authority to grant declaratory relief. We stated:

> A "controversy" in this sense must be one that is appropriate for judicial determination.... A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot.... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

live controversy before us. We do not reach the second issue because Kandianis is not a party to this action and KSPA fails to develop this argument. *See Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1992); *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980).

*Id.* at 998–99 (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464–465, 81 L.Ed. 617 (1937)).

No scallop harvesting presently takes place in closed Alaska waters. Therefore, KSPA's claims seeking declaratory and injunctive relief are technically moot. Nevertheless, we may choose to address certain issues if they fall under the public interest exception to the mootness doctrine.

■ The public interest exception requires the consideration of three main factors: (1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine. *Peloza v. Freas,* 871 P.2d 687, 688 (Alaska 1994); *Brandon,* 865 P.2d at 92 n. 6. None of these factors is dispositive; each is an aspect of the question of whether the public interest dictates that a court review a moot issue. *Hayes,* 693 P.2d at 834. Ultimately, the determination of whether to review a moot question is left to the discretion of the court. *Id.; Brandon,* 865 P.2d at 92 n. 6.

### 1. *Mootness of procurement issue*

■ The superior court held that allegations ADF & G violated the state's procurement code were moot. The State concedes that the procurement code should have been followed before authorizing the test-fishing operation. In addition, the Department of Law issued a directive to ADF & G advising the Department to comply with the code in the future. ADF & G stated it would do so.

KSPA maintains that the public interest exception to the mootness doctrine should apply. However, KSPA fails to demonstrate how this situation is likely to repeat, yet evade review. Given ADF & G's acknowledgment that the procurement code should have been followed and the directive the Department of Law issued to ADF & G, we conclude that there is little likelihood that

ADF & G will fail to follow the procurement regulations in the future, or that any future failures to follow the code would evade review.[6]

### 2. *Mootness of commercial fishing issue*

■ Because the Permit has been revoked, the question of the Commissioner's authority to issue the Permit is also technically moot. Nonetheless, the issue presents a live controversy. KSPA argues that by allowing a private fisher to sell fish obtained during a research trip, the Commissioner exceeded his authority by allowing "commercial fishing" in closed waters. ADF & G argues that it has the authority to finance an exploratory fishing operation by allowing a private contractor to sell the catch.

This issue falls within the public interest exception to the mootness doctrine. First, the issue is capable of repetition. The State has not disavowed this type of financial arrangement for future test-fisheries. Second, because research fishing may be of limited duration, it is likely that, as in this case, an individual permit would expire before the issue could be litigated. Third, the scope of the Commissioner's power is an issue of public interest.

Having determined that the commercial fishing issue satisfies the requirements of the public interest exception, and that the procurement issue does not, we turn to the merits of the trial court's decision.

### B. *Commissioner's Authority to Issue the Permit*

The trial court held that the Commissioner has the legal authority to issue an "exploratory permit ... for the purpose of conducting a test fishery." It further held that financing the operation through an agreement with a

---

**6.** We note that KSPA did not seek, and does not appear to have been in a position to seek, damages for ADF & G's failure to follow the procurement code. If a party-in-interest, such as a com-

petitor scallop fisher, had objected to the procedures by which this Permit was issued, his or her damage claim would not necessarily be mooted by expiration of the Permit.

private fisher that allowed the fisher to sell the catch did not constitute "commercial fishing" as defined by statute.[7]

■ We review the superior court's grant of summary judgment *de novo.* *Alaska Fish Spotters v. State,* 838 P.2d 798, 800 (Alaska 1992). Additionally, this case requires us to interpret AS 16.05.940 and AS 16.05.050. Interpreting these two statutes does not require special agency expertise. Therefore, the substitution of judgment standard applies when we interpret these statutes. *Forest v. Safeway Stores, Inc.,* 830 P.2d 778, 780 n. 3 (Alaska 1992).

There is no question that the Commissioner has the authority to conduct a test fishery. By statute, he or she may collect and disseminate statistics, conduct research, designate developing commercial fish species, and sell fish caught during a test fishing operation. AS 16.05.050(5), (11), (12), (15). KSPA concedes that the Commissioner may conduct test fishing in closed waters, contract with a third party to conduct a test fishery, and sell the fish caught during a test fishery.

KSPA's objection is twofold: first, that by allowing the fisher to keep and sell the fish caught, the Commissioner illegally opened a commercial fishery; and second, that issuing the Permit was an arbitrary and capricious administrative action.

■ We turn first to the financial arrangement between Kandianis and ADF & G. Alaska Statute 16.05.050(15) would clearly allow the Commissioner to sell the fish caught and give the proceeds to the private fisher as consideration for the testing services provided. We reject KSPA's argument that allowing a fisher to sell the fish transforms a test fishery into a commercial fishery. There is no material difference between allowing the private fisher to sell the catch and having the Commissioner sell the catch

and give the proceeds to the private fisher. The same quantity of fish would be caught, and the same compensation would be received by the fisher under either scenario. We therefore conclude that under AS 16.05.050, the Commissioner has the authority to finance test fisheries in the manner used here.[8]

KSPA's arbitrary and capricious argument also fails. KSPA contends that the Permit was a de facto regulation that opened a commercial fishery for a single person. KSPA argues that the Permit requires an adequate contemporaneous administrative record that explains why it was issued.

■ Initially, we note that KSPA is incorrect in calling the Permit a regulation. "Indicia for identifying a regulation include (1) whether the practice implements, interprets, or makes specific the law enforced or administered by the state agency, and (2) whether the practice 'affects the public or is used by the agency in dealing with the public.'" *Gilbert v. State, Dep't of Fish and Game,* 803 P.2d 391, 396 (Alaska 1990) (quoting *Kenai Peninsula Fisherman's Coop. Ass'n v. State,* 628 P.2d 897, 905 (Alaska 1981)). The Permit did not purport to promulgate or implement a resource management plan, nor does it govern the actions of any individuals aside from Kandianis.[9] We therefore review issuance of the Permit as an executive, not legislative, act.

We have described an agency's discretionary decision that does not require formal procedures as "quasi-executive" and have applied the abuse of discretion standard in reviewing such decisions. *Olson v. State, Dep't of Natural Resources,* 799 P.2d 289, 292–93 (Alaska 1990).

■ In this case, we find that ADF & G's decision to issue the Permit was not an abuse of discretion, and that the trial court did not

---

7. AS 16.05.940(5) defines commercial fishing as "the taking, fishing for, or possession of fish, shellfish, or other fishery resources with the intent of disposing of them for profit, or by sale, barter, trade, or in commercial channels...."

8. We note that the State has conceded that this type of funding arrangement is subject to the State procurement code. AS 36.30.100.

9. "Regulation" is defined by AS 44.62.640(3) as:

[E]very rule, regulation, order, or standard of general application ... [W]hether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public.

err in granting summary judgment to the State. ADF & G stated that the exploratory permit was issued to conduct a research trip. It argues that the Permit was issued to determine the "abundance of scallops and crab bycatch in two limited areas of the closed waters." That information was to be used in developing a scallop management plan the Department was preparing. The State supplied several affidavits that support its claim that the Permit was issued for research purposes. In addition, the Permit itself was titled "Exploratory Scallop Fishing Permit," and required that a state biologist observer be on board to collect and report data for the Department.

 Aside from asserting the agency's affidavits are post hoc rationalizations, KSPA does not directly challenge the statements made by ADF & G.[10] Moreover, KSPA does not argue that a factual dispute exists concerning the purpose for which the Permit was issued. Nor does KSPA present any evidence that the State's affiants were being untruthful. KSPA apparently did not attempt to depose the witnesses. Although some evidence supports KSPA's assertion that this test fishery was rushed and poorly planned, that evidence does not compel a conclusion that, as a matter of law, research was not the intended purpose of the Permit. There was other, unchallenged, evidence that the Permit was issued for the purpose of conducting a research fishery. Because the Commissioner has the express authority to conduct research, we conclude that the trial court properly granted summary judgment in favor of the State.[11]

## C. *Public Interest Litigant*

 The State argues that the superior court erred in denying the State's motion for attorney's fees based on the court's finding that KSPA was a public interest litigant.[12] We review this finding under the abuse of discretion standard of review. *Stein v. Kelso*, 846 P.2d 123, 127 (Alaska 1993); *Anchorage Daily News v. Anchorage School Dist.*, 803 P.2d 402, 403–04 (Alaska 1990).

We have identified four factors bearing on this inquiry:

(1) Is the case designed to effectuate strong public policies?

(2) If the Plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring the suit?

(4) Would the purported public interest litigant have sufficient economic motive to file suit even if the action involved only narrow issues lacking general importance?

*Anchorage Daily News*, 803 P.2d at 404.

 The State contends that the superior court did not directly address the fourth criterion. It argues that KSPA had sufficient economic incentive to bring this action. The State points to the representations made by KSPA that its members could suffer irreparable economic harm if scallop dredging were allowed in the closed area.

The superior court did not abuse its discretion. It is true that KSPA's members have a significant stake in the crab and bottom fish fisheries around Kodiak. However, possessing an economic interest does not necessarily destroy a party's capacity to be a public interest litigant. *Alaska Survival v. State*, 723 P.2d 1281, 1292 (Alaska 1986). The potential economic benefit to KSPA from this

---

**10.** We have held that although post hoc rationalizations are suspect and must be viewed critically, they still may be considered. *Alaska Int'l Constr., Inc. v. Earth Movers of Fairbanks*, 697 P.2d 626, 629 (Alaska 1985) (the possibility that an after-the-fact explanation is a post hoc rationalization "at most means that the court should subject the findings to more critical scrutiny."). The trial court did not err in considering the agency's affidavits.

**11.** KSPA also argues that the Permit violated the Alaska Constitution. Its argument relies on the premise that the Permit "created a special privilege of commercial fishing exclusively for the Permittee." Because we hold that the Permit was for research rather than commercial purposes, it is unnecessary to reach KSPA's constitutional claims.

**12.** The State moved for an award of $21,830, fifty percent of its attorney's fees.

litigation is indirect. KSPA will gain only if the areas are eventually reopened to crab fishing. The fact that KSPA sought only equitable relief, rather than damages, also indicates that economic motivation was not a significant factor in bringing this case. We find that the superior court did not abuse its discretion by finding KSPA to be a public interest litigant.

## IV. *CONCLUSION*

For these reasons, we AFFIRM the judgment entered below.