**NINILCHIK TRADITIONAL COUNCIL, Alaska Center for the Environment, Greenpeace, Trustees for Alaska, Kenai Peninsula Fishermen's Association, United Cook Inlet Drift Association, Appellants/Cross–Appellees,**

v.

**Harry NOAH, Commissioner, State of Alaska, Department of Natural Resources, James Eason, Director, Division of Oil and Gas, State of Alaska, Department of Natural Resources, and State of Alaska, Department of Natural Resources, Appellees/Cross–Appellants.**

Nos. S–6683, S–6733.

Supreme Court of Alaska.

Dec. 27, 1996.

---

Peter Van Tuyn, Trustees for Alaska, Anchorage, for Appellants/Cross–Appellees.

Mary Ann Lundquist, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees/Cross-appellants.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J., Pro Tem.*

*OPINION*

EASTAUGH, Justice.

## I. *INTRODUCTION*

This is an administrative appeal by the Ninilchik Traditional Council, Alaska Center for the Environment, Greenpeace, Trustees for Alaska, Kenai Peninsula Fishermen's Association, and United Cook Inlet Drift Asso-

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

ciation (collectively NTC). They oppose the decision of the Department of Natural Resources (DNR) to proceed with Oil and Gas Lease Sale 78 (Sale 78 or Sale). At issue are the procedural propriety and substantive basis of DNR's decision to proceed with the Sale. The cross-appeal addresses the public interest litigant status of two appellants, and a superior court order requiring DNR to bear the cost of preparing the administrative record on appeal. We affirm in part and reverse in part.

## II. FACTS AND PROCEEDINGS

Sale 78 encompasses nearly 403,000 acres of submerged land and tidelands in the Upper Cook Inlet and uplands on the Kenai Peninsula and in the lower Susitna Valley. The Sale area consists of ninety-two tracts, all of which are in Alaska's coastal zone and within the boundaries of the Kenai Peninsula and Matanuska–Susitna Boroughs and the Municipality of Anchorage. The Sale area supports a variety of wildlife and is home to important commercial, sport, and subsistence fisheries. Oil exploration and production have also occurred in Cook Inlet for several decades.

On September 9, 1993, DNR issued a conclusive consistency determination (CCD) that Sale 78 was consistent with the Alaska Coastal Management Program (ACMP), AS 46.40.010–210. DNR also issued a best interest finding (BIF) on October 19, 1993, determining that the Sale was in the state's best interests. On the basis of these findings, DNR approved the decision to proceed with Sale 78.

NTC challenged the validity of the CCD and the BIF in superior court. The superior court stayed the Sale, finding that NTC had demonstrated a probability of success on the merits of its claim. In its order granting the stay the superior court ruled that as public interest litigants, the NTC parties did not have to bear the cost of preparing the record for the full administrative appeal, and imposed that cost on the State. The court

denied the State's motion for rehearing on this issue.

The superior court subsequently held that the BIF and CCD were valid, and vacated its stay of the Sale. NTC appeals and the State cross-appeals.

## III. DISCUSSION

### A. The Conclusive Consistency Determination

Sale 78 must comply with the ACMP, because the Sale area is located within Alaska's coastal zone. 6 Alaska Administrative Code (AAC) 80.010(b) (1995). Under the ACMP, all "[u]ses and activities" conducted in the coastal zone by State agencies must be consistent with the standards of the ACMP and the coastal management programs of affected coastal districts (DCMPs). 6 AAC 80.010(b). Therefore, before DNR could authorize Sale 78, it had to make a conclusive consistency determination that the Sale was consistent with the ACMP standards and the incorporated standards of the affected DCMPs. 6 AAC 50.190(4), (9) (1995). NTC argues that this conclusive consistency determination was deficient for a number of reasons.[1]

#### 1. The conclusive consistency determination's reliance on the preliminary best interest finding

NTC contends that the September 9, 1993, CCD is invalid, because it relies on the consistency analysis contained in the Preliminary Best Interest Finding (PBIF) issued July 15, 1993, and does not analyze the Sale as finalized under the final BIF issued October 19, 1993. The PBIF includes a list of mitigation measures prescribed by DNR which the lessees must comply with in order for Sale 78 to be consistent with the ACMP. NTC argues that this analysis is insufficient, because the regulations require that the consistency analysis be conducted after imposition of all stipulations, conditions, and

---

1. The decision to delete a number of tracts from the Sale after the CCD was issued does not affect the structure of the Sale so as to implicate ACMP consistency concerns. NTC does not allege that

any other changes to the structure of the Sale between the date of the CCD (September 9) and the date of the BIF (October 19) raise consistency concerns.

modifications designed to ensure a project's consistency with the ACMP.[2]

The State maintains that a CCD need not be concurrent with the final BIF, because the BIF includes a determination that a project is consistent with the ACMP. The State argues that it is appropriate for DNR to make a consistency determination before proceeding to its final BIF, because it is "not practical for DNR to expend significant resources in making a BIF only to find later that the disposal was not consistent with the ACMP."

The issue is one of timing. The regulations implementing the ACMP define a CCD as

> a document issued by the coordinating agency containing a brief description of the project, and the findings of the consistency review together with any stipulations, conditions, or modifications to the project which must be attached to the applicable permits, and a brief justification for those necessary modifications, conditions, or stipulations.

6 AAC 50.190(9)(A) (1995). The modifications, conditions, and stipulations prescribed within the CCD are intended to achieve and maintain a project's consistency with the ACMP. When DNR adopts and subsequently amends operation permit terms prescribing mitigation measures to ensure a project's consistency with the ACMP, the agency should not have to review the project again

for consistency following compliance with those measures.

■ The September 9, 1993, CCD expressly makes its finding of consistency "subject to the stipulations and plan of operations permit terms outlined in the mitigation measures proposed in the July 15, 1993 [PBIF] and [the] ACMP Consistency Analysis as amended."[3] Therefore, because the finding of consistency was directly subject to these measures, we conclude that DNR could rely on the PBIF in issuing its CCD and that the CCD need not be concurrent with the final BIF in order to be valid.

### 2. The coastal development standard
#### a. Application of the standard at the lease sale stage

NTC also argues that DNR's CCD is invalid because it did not satisfy the coastal development standard. NTC contends that in its CCD DNR failed to determine specifically which activities are water-dependent, and then failed to give priority to any water-dependent uses and activities, particularly fishing, as required by the regulations.

The State responds that it properly applied the coastal development standard and prescribed general mitigation measures at the lease sale stage.[4] The State argues that it could not make a specific determination that a lessee's proposed activities would be "water-dependent" or "water-related" at this stage,[5] because it could not know whether

---

2. In effect, NTC argues that DNR cannot permit staged activities, but must impose all mitigation measures at the outset, including those that arguably apply only at the subsequent stages of operation and development, regardless of whether those stages are ever reached. We rejected a similar argument in *Trustees for Alaska v. State, Department of Natural Resources*, 851 P.2d 1340, 1347 (Alaska 1993) (*Camden Bay II*).

 We assume that DNR will impose appropriate measures to ensure compliance with the ACMP at each subsequent stage. If not, we assume that NTC or like public interest litigants will have sufficient incentive to demonstrate that DNR has failed to satisfy the requirements of the ACMP at that time.

3. On September 3, 1993, DNR issued a proposed CCD for Sale 78. This CCD responded to public comment on the PBIF, and included amendments to the proposed mitigation measures in order to increase protection of the coastal envi-

ronment. Receiving no objection to the proposed CCD from the reviewing State agencies and the affected coastal districts, DNR issued the final CCD on September 9, 1993.

4. The State halfheartedly argues that this standard did not apply at all at the lease sale stage. This argument is without merit. The specific standards of the ACMP have been applied to earlier oil and gas lease sales. *See Camden Bay II*, 851 P.2d at 1342–48.

5. "Water-dependent" is defined as a "use or activity which can be carried out only on, in, or adjacent to water areas because the use requires access to the water body." 6 AAC 80.900(17) (1995). "Water-related" is defined as "a use or activity which is not directly dependent upon access to a water body, but which provides goods and services that are directly associated with water-dependence and which, if not located adja-

the tract to be developed was located onshore or offshore.[6] A more focused application of the coastal development standard is reserved until lessees seek specific permission to undertake exploration.[7]

The ACMP coastal development standard provides:

> In planning for and approving development in coastal areas, districts and state agencies shall give in the following order, priority to:
>
> (1) water-dependent uses and activities;
>
> (2) water-related uses and activities; and
>
> (3) uses and activities which are neither water-dependent nor water-related for which there is no feasible and prudent inland alternative to meet the public need for the use or activity.

6 AAC 80.040(a) (1995).[8]

In applying the coastal development standard, DNR impliedly found that lessees' proposed activities at the lease sale stage were either water-dependent or water-related. In accordance with this finding, DNR proposed more than twenty general mitigation measures "designed to prevent significant interference with *other* water-dependent and water-related activities...." (Emphasis added.)

In *Trustees for Alaska v. State, Department of Natural Resources*, 851 P.2d 1340, 1346–47 (Alaska 1993) (*Camden Bay II*),

Trustees challenged an oil and gas lease sale CCD on the basis that DNR did not make an objective determination that the mitigation measures prescribed to ensure the sale's consistency with the ACMP would be effective. This court rejected that argument, holding that it was reasonable for DNR to prescribe general mitigation measures at the lease sale stage. *Id.* at 1347. The court explained:

> We find DNR's position reasonable. In our view, DNR's mitigation measures provide sensible guidelines to minimize the harmful effects of oil and gas development. Most importantly, the lessees cannot develop their leases until they submit detailed plans, which must satisfy the ACMP regulations. If the plans do not satisfy the ACMP regulations, DNR can impose additional mitigation measures that assure that the regulations are complied with. Thus we reject Trustees' argument to the extent that it would tie the reasonableness of DNR's consistency determination to its developing and assessing detailed mitigation measures even before knowing which activities it needs to mitigate.

*Id.*

In this case, DNR prescribed general mitigation measures which provide "sensible guidelines" to minimize the effects of development on "other water-dependent and water-related activities." These measures include Term 13, which "authorizes

---

cent to water, would result in a public loss of quality in the goods or services offered." 6 AAC 80.900(18) (1995).

**6.** The State argues that any future developments would nevertheless be water-dependent or water-related.

**7.** The State argues that scrutiny of such projects at discrete phases is contemplated by the ACMP. The term "project" is defined by the regulations as

> an activity or use which will be located in or may affect the coastal zone of Alaska and which is subject to consistency review under sec. 307 of the Coastal Zone Management Act of 1972, as amended (16 U.S.C. § 1456), or which requires the issuance of one or more state permits; *when a land or water activity is developed or authorized in discrete phases, and each phase requires agency decisions regarding permits, each phase is considered a "project."*

6 AAC 50.190(14) (1995) (emphasis added).

The legislature has subsequently enacted a statute expressly authorizing consistency determinations for phased uses and activities. AS 46.40.094, *enacted by* ch. 38, § 8, SLA 1994.

**8.** In a publication on the ACMP, the State of Alaska Office of Coastal Management commented that the purpose of the coastal development standard was that

> [r]ather than being specific to a use, this standard addresses the problems of limited waterfront space and the effects of dredging and filling. Subsection (a) establishes priorities for the limited amount of waterfront space. The standard can be applied to specific use proposals by determining whether a proposed use is water-related or water-dependent and whether a reasonable inland alternative exists.

Office of Coastal Management, State of Alaska & Office of Coastal Zone Management, U.S. Dep't of Commerce, *State of Alaska Coastal Management Program and Final Environmental Impact Statement* 56 (1979).

the director to restrict lease-related use to prevent unreasonable conflicts with subsistence and commercial fishing operations."

██ Because DNR determined that the proposed activities were either water-dependent or water-related, and prescribed general mitigation measures at the lease sale stage to ensure that these activities do not interfere with other water-dependent and water-related uses, we find that the coastal development standard is satisfied at this stage of the project.[9]

### b. *Priority of water-dependent uses*

NTC argues that even if a general analysis is appropriate at this stage, the CCD is still invalid because DNR failed to give priority to water-dependent uses, particularly fishing. NTC argues that oil and gas leasing activity is not a water-dependent use, because of the availability of techniques such as directional drilling, which can provide access to oil and gas deposits from land.[10] NTC contends that fishing and oil and gas exploration and development are in direct and irreconcilable conflict, and that because oil and gas lease activities rank lower than marine fishing and marine transportation in the hierarchy of uses, oil and gas development cannot occur.

The State responds that directional drilling and other land-based methods of accessing offshore tracts are necessarily utilized "adjacent to" Cook Inlet and, therefore, are "water-dependent." The State further argues that oil and gas development and fishing do not necessarily conflict, and that one activity need not exclude the other. The State argues that NTC's all-or-nothing approach is contrary to the core purpose of the ACMP and Alaska's constitutional mandate for the management of State lands,[11] and that giving priority to one use over another does not mean altogether abandoning any use that conflicts with the preferred use.

██ The ACMP envisions management of the coastal zone for multiple uses. *See* AS 46.40.020(4). Multiple use management is inconsistent with simply identifying "conflicts" among uses and then applying a hierarchy of uses to exclude lesser ranking uses; instead, it inherently contemplates harmonizing competing uses whenever possible. AS 46.40.020(4) (providing that management of coastal land and water uses will "generally" give priority to those which are economically or physically dependent on coastal location, thus implying that other uses are not excluded). DNR has done this to the extent it reasonably could at the lease sale stage. It will have to do so again at the exploration and development stages, if they are reached. Consequently, we find that DNR's CCD for Sale 78 conforms with the ACMP coastal development standard.

### 3. *The habitats standard*

NTC also contends that the CCD is invalid because it did not satisfy the habitats standard of the ACMP. The habitats standard provides that coastal area habitats "must be managed so as to maintain or enhance the biological, physical, and chemical characteristics of the habitat which contribute to its capacity to support living resources." 6 AAC

---

**9.** Although it would be preferable, as NTC proposes, that the lease or mitigation measures expressly mandate nonadjacent directional drilling when possible, the failure to do so does not render the mitigation measures ineffective in this case.

**10.** We note that the State appears to concede that directional drilling, if feasible and prudent, should be required, but that this requirement can be added later. The State admits that "if it is feasible and prudent to access oil and gas deposits within the fishing corridor by directional drilling activity, the law requires directional drilling." Given the State's concession, a failure by DNR to impose this specific measure when actual activity is proposed would presumably warrant judicial relief.

**11.** Alaska's Constitution expresses a policy of encouraging development of the State's resources "by making them available for maximum use consistent with the public interest." Alaska Const. art. VIII, § 1. The constitution charges the legislature with "provid[ing] for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people." Alaska Const. art. VIII, § 2. The legislature is authorized to provide for leasing of State lands for exploration, "subject to reasonable concurrent uses." Alaska Const. art. VIII, § 8. These constitutional provisions contemplate management of State land for multiple uses.

80.130(b); *see also* 6 AAC 80.130(c) (1995). DNR may permit uses or activities which do not maintain and enhance the coastal habitat only if it finds

(1) there is a significant public need for the proposed use or activity;

(2) there is no feasible prudent alternative to meet the public need for the proposed use or activity which [would maintain and enhance the coastal habitat];

(3) all feasible and prudent steps to maximize conformance with [this section's standards] will be taken.

6 AAC 80.130(d) (1995).

■ DNR found in its consistency analysis that "if oil and gas deposits are discovered in the proposed sale area, there may be uses or activities in the sale area which will not 'maintain or enhance the biological, physical, and chemical characteristics' of the coastal habitat in which they are located." Accordingly, DNR was required to perform the three-part analysis under 6 AAC 80.130(d). DNR found that each element necessary to satisfy the analysis was present. NTC charges that each of these findings was inappropriate and, therefore, that DNR violated the habitats standard. This court's "review is limited to ensuring that DNR's decision was not arbitrary, capricious, or unreasonable." *Camden Bay II*, 851 P.2d at 1347.

### a. *Significant public need*

DNR found that the first part of the test was satisfied, as there is a significant public need for the proposed oil and gas lease sale. DNR found that there was a public need for the revenue from the Sale, which would help offset projected revenue declines. DNR also found that proceeds from the Sale would provide much-needed local revenue, and that there was a significant public need for jobs that would be created by exploration and, if it occurs, development.

In *Trustees for Alaska v. State, Department of Natural Resources*, 795 P.2d 805 (Alaska 1990) (*Camden Bay I* ), we discussed the benefits to the State of oil and gas lease

development in the context of a BIF for an oil and gas lease sale. In that BIF, DNR discussed the State's dependence on petroleum-related income, and the long-range goal of the State of utilizing the oil and gas lease program to provide the basis for a stable and prosperous economy. *Id.* at 810. It found that the State would benefit from the bonus payments received from oil companies for the privilege of leasing whether or not actual deposits are discovered, and that if actual development does occur, it will make it more economically feasible for other companies in the area to develop existing oil deposits. *Id.* Consequently, we held that DNR's decision that the sale was in the best interests of the State was not arbitrary or capricious. *Id.* at 809–10.

■ In accordance with the holding in *Camden Bay I*, we conclude that DNR properly determined that there is a significant public need for oil and gas lease Sale 78. The first element of the 6 AAC 80.130(d) analysis is therefore satisfied.

### b. *Feasible and prudent alternative*

DNR also found that the second element of the 6 AAC 80.130(d) analysis was satisfied, because there is no feasible and prudent alternative available to meet the public need for the proposed oil and gas lease sale.[12] The State maintains that while it might be feasible to offer less promising areas for lease, it would not be prudent because potential lessees have expressed an interest in the Sale 78 area. NTC argues that DNR failed to demonstrate that there is no feasible and prudent alternative to Sale 78.

In *Camden Bay I*, DNR based its finding that the sale was in the State's best interest in part on the fact that if development occurred it would make development of existing oil deposits near the sale area economically feasible. 795 P.2d at 810. In *Camden Bay II*, DNR found that industry interest in the area was significant, and concluded that it would not be prudent to lease areas of lesser potential. Accordingly, we found that DNR had articulated sufficient support for its find-

12. It appears that "feasible prudent" in 6 AAC 80.130(d)(2) should read "feasible and prudent." The parties quibble over the omission of the word "and." However, the omission of that word in 6 AAC 80.130(d)(2) appears to be nothing more than a drafting or transcription error.

ing that no feasible and prudent alternative existed for the proposed sale. 851 P.2d at 1348.

In this case, DNR also considered economic factors in determining the existence of a feasible and prudent alternative, including the prudence of offering the area selected for development as opposed to another area. DNR found that

> [t]he only feasible alternative to offering lands in the coastal zone is to offer lands outside of the coastal zone. Given the public need for oil and gas revenues, however, this is not a prudent alternative in Alaska because most of the prospective acreage and facilities infrastructure lies in coastal areas.

Because DNR had a reasonable basis for finding that there was no feasible and prudent alternative available, we hold that DNR satisfied the second part of the tripartite test.

### c. Feasible and prudent steps to maximize conformance with the habitats standard

Finally, DNR found that the third element of the tripartite analysis was met as it had taken all "feasible and prudent steps to maximize conformance of the sale with 6 AAC 80.103(b) and (c) at the lease sale stage." DNR based this finding on its determination that the mitigation measures prescribed in the lease provide adequate support for the habitats standard. NTC charges that DNR improperly found that all feasible and prudent steps to maximize conformance with the habitats standard had been required.

**13.** NTC argues that DNR should have prescribed further measures, such as directional drilling, to eliminate potential adverse impacts on other resources. Requiring a term stating that onshore drilling will be required when it is "feasible and prudent" is premature at this stage. Such a term should be considered at the development stage, when an accurate assessment of the feasibility of directional drilling, based on current technology and geographical limitations, can be made. Currently,

> [a]ccording to petroleum engineers on staff with the DO & G, directional drilling techniques now make it possible to reach up to 15,000 feet, almost three-miles, horizontally from the actual drill site.... This may vary

In *Camden Bay II* DNR identified twenty lease stipulations expressly designed to achieve maximum compliance with the goals of maintaining and enhancing the coastal habitat. *Camden Bay II*, 851 P.2d at 1347. DNR found that the lease terms and stipulations complied with ACMP standards and minimized the sale's impact on the environment. *Id.* at 1348. The court held that this analysis was sufficient to support DNR's finding of compliance with the habitats standard. *Id.*

In this case, DNR found that

> [t]he proposed permitting terms and lease stipulations represent all feasible and prudent steps necessary to maximize conformance of the sale with 6 AAC 80.130(b) and (c) at the lease sale stage. Additional measures may be identified and imposed when specific development activities are reviewed for consistency with the ACMP through the permitting process.

In accordance with this finding DNR proposed more than twenty terms and stipulations to minimize the Sale's impact on the environment.[13] For example, Term 2 requires the "use of vehicles which do not damage the vegetation or ground surface [during exploration]. The term restricts road construction during exploration by requiring the use of existing road systems, port facilities, or air services whenever feasible." Also, Term 9 "regulates the siting and construction of pipelines to prevent obstruction to marine navigation and fishing operations, and to provide protection from climatic conditions, tides, currents, and geophysical hazards."

> according to where the actual oil deposit is located, how deep the well is drilled and the type of geology or rock that had to be drilled through to reach the deposit.

It may be that measures even more protective than directional drilling will be required and available at the development stage. Although it would be preferable to include such requirements conditionally in the mitigation measures, the failure to do so is not fatal to DNR's finding. *See supra* note 9.

Judicial review of the adequacy of measures prescribed by DNR prior to development or operation will ultimately determine whether those measures fail to require all feasible and prudent steps to maximize conformance with the ACMP.

It is clear from the detailed and particular nature of these stipulations that DNR took a "hard look" at the feasible and prudent steps necessary to minimize the impact of the Sale on the habitat. Therefore, we hold that DNR's analysis demonstrates a reasonable basis for its finding that all feasible and prudent steps to maximize conformance with the habitats standard have been taken.

### 4. Consistency with local district management programs

Finally, NTC charges that the CCD is invalid because DNR failed to comply with the relevant DCMPs—for the Kenai Peninsula Borough (Kenai), the Matanuska–Susitna Borough (Mat–Su), and the Municipality of Anchorage (Anchorage). NTC argues that DNR is obligated to make an independent determination that the Sale is consistent with each DCMP, and that DNR failed to apply the requirements of the DCMPs to the Sale.

### a. District concurrence

Under the ACMP, DNR must find that Sale 78 is consistent with the Kenai, Mat–Su, and Anchorage DCMPs. The ACMP regulations provide:

> Uses and activities conducted by state agencies in the coastal area *must be consistent with the applicable district program* and the standards contained in this chapter.

6 AAC 80.010(b) (emphasis added). An agency can authorize a use or activity in the coastal zone only if "the agency finds that the use or activity is consistent with the applicable district program." *Id.* The State argues that DNR could rely on the districts' concurrence with its consistency determination as the basis for its finding that Sale 78 was "consistent with the applicable district program[s]."

Agencies give substantial deference to a district's interpretation of its CMP requirements. According to ACMP regulation 6 AAC 50.120(a) (1995), an agency rendering a CCD should give deference to the comments of "affected coastal districts with approved programs." The regulation observes that "[a] coastal resource district whose district program has been incorporated into the ACMP is considered to have expertise in the interpretation and application of its program." 6 AAC 50.120(a). Because the regulations mandate such deference to the districts themselves, DNR can rely on the concurrence of coastal districts as one basis for its conclusion that a sale is consistent with the DCMPs.[14] This deference does not, however, relieve DNR of the duty to independently determine that the Sale is consistent with the affected DCMPs. 6 AAC 80.010(b).

### b. DNR's application of the district CMPs

If an affected coastal district does not expressly concur in DNR's CCD, DNR must apply the local DCMPs to the extent it reasonably can at the lease sale stage. *See* 6 AAC 50.120(a) (1995).

### (1) The Kenai district CMP

The Kenai district expressed its concurrence by letter. Therefore, DNR could properly rely on the district's express finding that the Sale is consistent with its CMP. Nonetheless, and despite the deference DNR owes to the findings of a local district, 6 AAC 80.010(b) required DNR to determine independently that the Sale is consistent with the Kenai DCMP. The record does not indicate that DNR made any such determination. Instead, DNR's final finding is arguably inconsistent with the Kenai DCMP requirement that the cumulative effects of a consistency determination be examined. DNR stated that Cook Inlet was a "mature petroleum

---

14. The State also argues that a district's failure to object can be considered as a concurrence. The State cites 6 AAC 50.070(j) (1995) which provides:

> If ... an affected coastal resource district with an approved program ... does not concur with the proposed consistency determination, it may request elevation of the review by sub-

mitting a written statement which describes its concerns and includes a proposed alternative consistency determination which would meet its concerns.

We do not find this argument persuasive. A district's failure to object does not amount to an express concurrence that a sale complies with the DCMP.

province" but did not address possible effects of the federal Cook Inlet leasing program or a coal processing project. Further, DNR's lease stipulations may squarely conflict with the express terms of the DCMP's mitigation standard.

We remand to DNR with directions to independently determine whether the Sale is consistent with the Kenai DCMP.

### (2) *The Anchorage district CMP*

The Municipality of Anchorage did not expressly concur in DNR's CCD for Sale 78. Therefore, 6 AAC 80.010(b) required DNR to apply the Anchorage DCMP standards to the Sale tracts within the Municipality of Anchorage to be consistent with the ACMP.

NTC argues that DNR failed to comply with the Anchorage DCMP because it failed to prefer development of tracts in "areas already developed." According to NTC, DNR failed to comply with this goal because, instead of looking at the specific areas in question, it considered the entire Cook Inlet as one developed area. The State responds that this approach is appropriate, as the tracts within the Municipality of Anchorage are designated by the DCMP as "Class IV waters." Class IV waters are classified under "utilization environment," which comprises areas recognized as being potentially suitable for future growth and development. The State argues that the "preference for 'development within already developed areas' is embodied in the classification of Class IV waters."

█ Based on the Anchorage DCMP, the designation of an area as Class IV waters does not appear to mean that all parts of that area are in fact already developed; it means that they are subject to development. DNR discussed the Anchorage DCMP briefly, but nowhere considered the DCMP's goal that "[e]mphasis should be given to development within already developed areas." Consequently, DNR did not comply with the Anchorage DCMP. We remand to DNR with instructions to consider the Anchorage DCMP's goal of "emphasi[zing] ... development within already developed areas."

### (3) *The Mat–Su district CMP*

The Mat–Su Borough did not expressly concur in DNR's CCD for Sale 78. Therefore, DNR also had to apply the Mat–Su DCMP standards to tracts within that borough for the Sale to be consistent with the ACMP.

NTC argues that, among other things, DNR failed to comply with the Mat–Su DCMP's mitigation technique requirements. The State replies that DNR reasonably addressed the mitigation concerns of the Mat–Su DCMP at the lease sale stage, and will apply the requirements more specifically at the exploration and development stages.

Coastal Habitats Standard 6 of the Mat–Su DCMP provides that

> [m]itigation techniques ... shall include replacing stream bank vegetation where possible [and] creation of oil and grease separators prior to road development runoff entering rivers, lakes, and streams, creation of settlement systems prior to development runoff entering stream corridors thereby decreasing sedimentation.

█ Lease Term 21 addressed this mitigation standard, and provides in relevant part:

> At the option of the state, all improvements such as roads, pads, and wells must either be abandoned and the sites rehabilitated by the lessee to the satisfaction of the state, or be left intact and the lessee absolved of all further responsibility as to their maintenance, repair, and eventual abandonment and rehabilitation.

However, this lease term is vague and standardless, and gives DNR the discretion not to require revegetation at a later stage. It therefore does not satisfy the Mat–Su mitigation technique requirements. Accordingly, we remand to DNR with instructions to consider the Mat–Su DCMP's mitigation standard in rendering its CCD.

### B. *The Best Interest Finding*

NTC asserts that DNR improperly issued its BIF, as direct conflicts will inevitably arise between oil and gas exploration and development activities and fishing in parts of the Sale area. NTC argues that DNR failed to "resolve" these conflicts in its BIF, and

instead improperly deferred imposing restrictions which could address these conflicts until the exploration and development stages.

The State responds that DNR considered potential conflicts between fishing and any future oil and gas development to the extent reasonably possible at the lease sale stage, and that it did not defer the resolution of such conflicts until the future.

■■■■ This court reviews DNR's best interest determination "only to the extent necessary to ascertain whether the decision has a 'reasonable' basis," and to ensure that it "was not arbitrary, capricious, or prompted by corruption." *Camden Bay I*, 795 P.2d at 809 (quoting *Hammond v. North Slope Borough*, 645 P.2d 750, 758, 759 (Alaska 1982)). "If an agency does not consider an important

factor, its decision is regarded as arbitrary, and those important factors which it did consider, must be discussed in the decisional document." *Camden Bay I*, 795 P.2d at 811.

Before DNR can approve the disposal of State land, the Commissioner, or the director of the DNR division with jurisdiction over the disposition in question acting with the consent of the Commissioner, must make a "written finding that the interests of the state will be best served" by such action. AS 38.05.035(e).[15] In this case, the Director of the Division of Oil & Gas, James Eason, determined that Sale 78 would be in the State's best interest.[16]

In approving the Sale, DNR considered and addressed potential conflicts between fishing and oil and gas exploration and development at the lease sale stage. The BIF

---

**15.** The legislature has since specified that a preliminary or final best interest finding must consider and discuss

 (1) ... facts that are known to the director at the time of preparation of the finding and that are
 (A) material to issues that were raised during the period allowed for receipt of public comment, whether or not material to a matter set out in (B) of this paragraph, and within the scope of the administrative review established by the director under (e)(1) of this section; or
 (B) material to the following matters:
 (i) property descriptions and locations;
 (ii) the petroleum potential of the sale area, in general terms;
 (iii) fish and wildlife species and their habitats in the area;
 (iv) the current and projected uses in the area, including uses and value of fish and wildlife;
 (v) the governmental powers to regulate oil and gas exploration, development, production, and transportation;
 (vi) the reasonably foreseeable cumulative effects of oil and gas exploration, development, production, and transportation on the sale area, including effects on subsistence uses, fish and wildlife habitat and populations and their uses, and historic and cultural resources;
 (vii) lease stipulations and mitigation measures, including any measures to prevent and mitigate releases of oil and hazardous substances, to be included in the leases, and a discussion of the protections offered by these measures;
 (viii) the method or methods most likely to be used to transport oil or gas from the lease sale area, and the advantages, disadvantages, and relative risks of each;
 (ix) the reasonably foreseeable fiscal effects of the lease sale and the subsequent activity on the state and affected municipalities and com-

munities, including the explicit and implicit subsidies associated with the lease sale, if any;
 (x) the reasonably foreseeable effects of oil and gas exploration, development, production, and transportation on municipalities and communities within or adjacent to the lease sale area; and
 (xi) the bidding method or methods adopted by the commissioner under AS 38.05.180; and
 (2) the basis for the director's preliminary or final finding, as applicable, that, on balance, leasing the area would be in the state's best interest.
AS 38.05.035(g), *enacted by* ch. 38, § 3, SLA 1994 (effective Aug. 7, 1994).

**16.** Eason explained his decision as follows:

The state's interests in development of its petroleum resources is vital to its wellbeing and to the support of all its citizens in maintaining the quality of their life. With the mitigation measures imposed on leases and plans of operations, the petroleum resources of the sale area can most likely be explored and developed without significantly affecting fish and wildlife populations or traditional human uses. The state has sufficient authority from general statutory and regulatory empowerments, the lease contract, lease stipulations, and plan of operations permit terms to ensure that lessees conduct their activities safely and in a manner that protects the integrity of the environment and maintain opportunities for subsistence uses.
On the basis of the foregoing findings, applicable laws and regulations, and the documents reviewed during preparations for Sale 78, I conclude that, all things considered, the potential benefits of the sale outweigh the possible adverse impacts, and that Oil and Gas Lease Sale 78, Cook Inlet, will best serve the interests of the state of Alaska.

contains a separate section entitled "Current and Projected Uses in the Sale Area, Including Uses and Values of Fish and Wildlife." This section discusses the fisheries the lease area supports and their importance and value, including the salmon set and drift net fisheries. At numerous points throughout the BIF, DNR recognized the possibility that oil and gas activities might conflict with these fisheries. DNR prescribed specific mitigation measures in the BIF to minimize the impact of these potential conflicts.[17] DNR also discussed its belief that fisheries would be sufficiently protected through application of various statutory and regulatory authorities designed to minimize the negative impacts of oil and gas activities, including the ACMP, at the time lessees seek permission to undertake specific activities.[18]

DNR is not required to "resolve" all potential conflicts, but it must address them and, to the extent permitted by available knowledge, prescribe measures to minimize them. DNR attempted to harmonize conflicting uses so that both fishing and oil and gas activity could take place; however, it was not required to give an absolute priority to one over the other.

■■■ Because DNR considered the potential conflicts between fishing and oil and gas activities in reaching its decision that Sale 78 is in the State's best interest, and because it discussed these factors in its decisional document, we hold that DNR gave the necessary hard look in issuing its BIF. Therefore, we AFFIRM the superior court's holding that the BIF was valid.

17. For example, in response to a public comment that oil and gas leasing was incompatible with fishing because offshore oil platforms and underwater pipelines would interfere with fishing boats, DNR explained:

This possible conflict is addressed by Term 13 which states the director may restrict lease-related uses to prevent conflicts with subsistence and commercial fishing operations. In enforcing this term the division, during review of plans of operation, will work with other agencies and the public to assure that potential conflicts are identified and avoided to the fullest extent possible. Available options include alternative site selection, requiring directional drilling, buried pipelines, and seasonal drilling restrictions. Plans of operation are subject to

## C. *The Superior Court's Public Interest Litigant Status Determination and Order that DNR Bear the Costs of Preparing the Record for Appeal*

### 1. *Public interest litigant status*

■■■ The State cross-appeals from the superior court's determination that United Cook Inlet Drift Association (UCIDA) and Kenai Peninsula Fishermen's Association (KPFA) are public interest litigants.[19] This court reviews a trial court's finding as to a litigant's public interest status under the abuse of discretion standard. *Keane v. Local Boundary Comm'n*, 893 P.2d 1239, 1250 (Alaska 1995).

The State argues that UCIDA and KPFA had an economic incentive to appeal the superior court's decision, and therefore do not qualify as public interest litigants. The State contends that the superior court abused its discretion by ignoring this economic interest, based on its finding that a public right was being litigated.[20] NTC asserts that UCIDA and KPFA are public interest litigants under Alaska law.

In *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191 (Alaska 1995), we considered four factors in determining the public interest litigant status of a party:

(1) Is the case designed to effectuate strong public policies?

(2) If the Plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring the suit?

the [Kenai district] CMP. Proposed operations will be evaluated and restrictions will be applied on a case-by-case basis depending on the specific activity proposed, its location and the time of year it will take place.

18. DNR also considered establishing seasonal restrictions or surface entry restrictions to avoid conflicts between fishing and oil and gas activities.

19. The State does not challenge the public interest litigant status of the remaining Appellants.

20. The State concedes that the first three requirements for public interest litigant status are satisfied, but argues that the fourth is not.

(4) Would the purported public interest litigant have sufficient economic motive to file suit even if the action involved only narrow issues lacking general importance? *Id.* at 1198. In that case, the State argued that the superior court abused its discretion by not directly addressing the fourth criterion in its determination that the Kodiak Seafood Processors Association (KSPA) was a public interest litigant. The State claimed that KSPA had sufficient economic incentive to bring an action, because its members could suffer "irreparable economic harm" if the scallop dredging at issue was allowed in a closed area. *Id.*

We rejected the State's argument, and held that the superior court had not abused its discretion. We stated that "[i]t is true that KSPA's members have a significant stake in the crab and bottom fish fisheries around Kodiak. However, possessing an economic interest does not necessarily destroy a party's capacity to be a public interest litigant." *Id.* We found that the potential economic benefit to KSPA from the litigation was indirect. We also found that the fact that KSPA sought only equitable relief and not damages indicated that economic motivation was not a significant factor in bringing the case. *Id.* at 1199. Based on these findings, we held that the superior court did not abuse its discretion in determining that KSPA was a public interest litigant. *Id.*

In this case, as in *Kodiak Seafood Processors,* any economic benefit to the parties from the litigation is indirect. The superior court found that

> [w]hile it is true that the appellant's [sic] include fishing organizations ... it is public rights that are at stake here. The fact that an organization may have an economic interest in whether or not tracts of land are sold to oil companies, does not obscure the fact that it is a public right being litigated.

Similarly, the parties here have made no claim for monetary damages, indicating that economic motivation was not a significant factor in bringing the claim. Therefore, in accordance with *Kodiak Seafood Processors,* we hold that the superior court did not abuse its discretion in finding that KPFA and UCIDA were public interest litigants.

**2. *Cost of preparing the record for appeal***

The State argues that the superior court, having determined public interest litigant status at the onset of litigation, erred in requiring the State to bear the cost of preparing the administrative record on appeal. NTC argues that the superior court did not err, but rather exercised its broad discretion under Appellate Rule 521 to relax the application of Appellate Rule 604 in this case.

We need not address this issue. Because we reverse and remand, NTC must be considered the prevailing party on appeal. The issue is consequently moot.

**IV. CONCLUSION**

We AFFIRM the superior court's holding that DNR could rely on its preliminary best interest finding in its conclusive consistency determination. We also AFFIRM the superior court's holding that the conclusive consistency determination satisfied the coastal development standard at this stage, and the superior court's finding that DNR satisfied the habitats standard. However, we REVERSE the superior court's holding that all of the district coastal management programs were properly met. Accordingly, we REMAND to DNR with instructions to consider the district coastal management programs of the Kenai Peninsula Borough, the Municipality of Anchorage, and the Matanuska–Susitna Borough in issuing its consistency analysis.

We AFFIRM the superior court's holding that DNR's best interest finding for the Sale was adequate.

As to the cross-appeal, we AFFIRM the superior court's holding that KPFA and UCIDA were public interest litigants. We do not address the claim that the court erroneously imposed the cost of preparing the appellate record on the State, as the issue is moot.

MATTHEWS, Justice, dissenting in part.

I dissent from one aspect of today's opinion.

Part III.A.2 of the opinion discusses the coastal development standard applicable at the lease sale stage. The standard in question is embodied in 6 AAC 80.040(a). It mandates that in planning for and approving development in coastal areas priority shall be given in the following order to

(1) water-dependent uses and activities;

(2) water-related uses and activities; and

(3) uses and activities which are neither water-dependent nor water-related for which there is no feasible and prudent inland alternative to meet the public need for the use or activity.

DNR did not address the question whether undersea leases accessible by directional drilling from shore were water-dependent uses. Under the definition of water-dependency, the critical inquiry is whether onland directional drilling can be conducted far enough back from the shore so that it is not "adjacent" to the shore.[1] Given the priorities expressed in 6 AAC 80.040(a), in areas of conflict DNR may not permit nonwater-dependent activities which conflict with existing water-dependent activities. This means that DNR has a duty to require nonadjacent directional drilling where nonadjacent directional drilling is feasible.

DNR concedes that, if feasible, directional drilling should be required, but states that there was no reason to require this at the lease sale stage since it can, in some fashion, be imposed later. I quote from footnote 19 of DNR's brief:

Therefore, if it is feasible and prudent to access oil and gas deposits within the fishing corridor by directional drilling activity, the law requires directional drilling. To require DNR to repeat in its mitigation measures laws that apply with specificity in the future when an actual activity is proposed, is irrational.

Today's opinion notes DNR's concession, Op. at n. 10, expresses the view that it would be preferable "that the lease or mitigation measures expressly mandate nonadjacent directional drilling when possible," Op. at n. 9, but holds that DNR was not required to impose such lease or mitigation measures at the lease sale stage.

I disagree. DNR is required to take "all feasible and prudent steps to maximize" the biological and physical habitat of the inlet when permitting activities such as oil exploration, drilling and extraction, which are potentially degrading to the environment. 6 AAC 80.130(d). The requirement that *all* feasible and prudent steps be taken is not inherently flexible. If there is a feasible and prudent step which would tend to protect the environment, that step *must* be taken.

The leases issued by DNR could require nonadjacent directional drilling when such drilling is feasible from a technical and economic standpoint. Inclusion of such a requirement would forestall claims by lessees that this is not a requirement that they have bargained for, and thus would reduce the chances that conventional drilling will take place where directional drilling is feasible. By failing to impose a requirement of directional drilling when feasible DNR has violated the "all feasible and prudent steps" command of 6 AAC 80.130(d).

On remand I would add the following instruction:

DNR should insert in the leases a clause that nonadjacent directional drilling will be required where feasible. If a particular lessee does not agree to this clause, the affected lease should be rescinded.

---

**1.** "Water-dependent" is a "use or activity which can be carried out only on, in, or adjacent to water areas because the use requires access to the water body." 6 AAC 80.900(17).