**ALASKA CENTER FOR THE ENVIRONMENT; Anchorage Waterways Council; and Anchorage Audubon Society, Appellants,**

v.

**STATE of Alaska, Office of the Governor, Office of Management & Budget, Division of Governmental Coordination, Appellee.**

No. S–10870.

Supreme Court of Alaska.

Nov. 28, 2003.

---

Before: BRYNER, Chief Justice,
MATTHEWS, EASTAUGH, FABE, and
CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

The Alaska Center for the Environment (ACE) raises several challenges to the consistency review performed by the Division of Governmental Coordination (the Division) under the Alaska Coastal Management Program (ACMP) for the application by Ted Stevens Anchorage International Airport (the Airport) to the U.S. Army Corps of Engineers for permission to fill wetlands in the process of expanding the airport. ACE's primary contention, influencing several of its claims, is that the Division could not review for consistency a project that was a broad plan for expansion containing hypothetical development scenarios, as opposed to a specific proposal for particular uses. ACE also challenges the Division's determination that the Airport's project satisfied various state and municipal standards. Because a broad plan can be a "project," and because the Division had a reasonable basis for its finding of consistency, we affirm the Division's consistency determination in all respects.

## II. FACTS AND PROCEEDINGS

In June 1999 Anchorage International Airport submitted an application to the U.S. Army Corps of Engineers under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, seeking a ten-year "long-term individual permit" to dredge and fill 240 acres of wetlands in Turnagain Bog and Postmark Bog to allow the airport to expand. Because the permit and expansion involved the coastal zone and because a federal permit was required, the Alaska Coastal Management Act[1] and its regulations directed the Division of Governmental Coordination—within the Office of Management and Budget in the Governor's Office—to review the project for consistency

Michael J. Frank, Trustees for Alaska, Anchorage, for Appellants.

James E. Cantor and Blaine H. Hollis, Assistant Attorneys General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

1. AS 46.40.010–.210 (1977, 1994) (amended 2003). Many amendments to the Coastal Management Act and its regulations at 6 AAC 50 took effect in 2003. All references in this opinion are to the statutes and regulations in effect when the Division issued its consistency determination in 2000.

with the Alaska Coastal Management Program.[2]

To begin this review process, the applicant must submit a packet of information including all state and federal permit applications and a coastal project questionnaire.[3] The information the Airport submitted contained likely development scenarios for the airport that could occur under the Corps permit. Upon receiving the Airport's information, the Division initiated an ACMP consistency review. The Division published a public notice describing the Airport's application and soliciting public comments; the deadline for comments was extended several times. ACE submitted comments opposing a finding of consistency and noting that the lack of a specific project description made it impossible for the Division to perform adequately the necessary ACMP review. In September 2000 the Division issued its Final Consistency Determination approving the Airport's proposal.

ACE appealed the Division's consistency determination to the superior court, arguing that the Airport's proposal was not specific enough for the Division to review it adequately for consistency with the ACMP, that the lack of specificity meant that the Division could not and did not correctly evaluate the proposal against various state and municipal standards, and that the Division improperly deferred to the Municipality of Anchorage in assessing consistency with some statewide standards. The superior court concluded that the Airport's proposal was sufficiently specific for a consistency review and that the Division adequately considered the state and municipal standards.

ACE appeals to this court, again arguing that the Airport's proposal was not specific enough to be a "project" amenable to ACMP

consistency review, that the Division failed to review all uses and activities associated with the proposal, and that the Division did not correctly apply the state and municipal standards.

## III. DISCUSSION

### A. The Airport's Proposal Is a "Project" Amenable to ACMP Review.

The issue of how specific a proposal must be before it can be considered a "project" ready for consistency review under the ACMP is one that underlies numerous claims in this appeal.

#### 1. Standard of review

■ When we consider an administrative appeal from a decision rendered by the superior court acting as an intermediate appellate tribunal, we review the agency's determination directly; we do not defer to the superior court's decision.[4] We have identified at least four main standards of review of agency decisions: "the 'substantial evidence test' for questions of fact; the 'reasonable basis test' for questions of law involving agency expertise; the 'substitution of judgment test' for questions of law where no expertise is involved; and the 'reasonable and not arbitrary test' for review of administrative regulations."[5]

■ The extent to which AS 46.40 and its regulations allow the Division to initiate an ACMP consistency review for a permit that authorizes a broad range of possible activities is a question of law and statutory interpretation not meaningfully implicating agency ex-

2. *See* AS 44.19.145(a)(11) (providing that Office of Management and Budget within Office of the Governor is to "render, on behalf of the state, all federal consistency determinations and certifications authorized by 16 U.S.C. 1456 (Sec. 307, Coastal Zone Management Act of 1972), and each conclusive state consistency determination when a project requires a permit, lease, or authorization from two or more state resource agencies"); 6 AAC 50.030(a) (repealed 2003) (directing the Division to "coordinate the review and render a determination for a project which

requires the permits of two or more state agencies or a federal permit").

3. 6 AAC 50.070(a)-(c) (repealed 2003).

4. *Cook Inlet Keeper v. State*, 46 P.3d 957, 961 (Alaska 2002); *Kachemak Bay Conservation Soc'y v. State, Dep't of Natural Res.*, 6 P.3d 270, 275 (Alaska 2000).

5. *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975).

pertise; we therefore apply the "substitution of judgment" standard of review.[6]

## 2. A "project" can encompass a broad proposal.

The long-term wetlands permit application that the Anchorage International Airport submitted to the Corps and to the Division described the types of facilities expected to be developed under the permit: "Facilities expected to be required and developed under this permit include AIA infrastructure (runways, taxiways, snow disposal sites, field maintenance facilities, etc.), commercial aviation facilities (cargo handling, freight forwarding, business aircraft servicing, etc.), and general aviation facilities (aircraft parts and repair services, etc.)." The application also contained non-exclusive lists of possible uses divided into three categories (runway-dependent, aviation and aviation-related commercial and support use, and uses allowed with special conditions), as well as a description of prohibited uses. The Airport noted in its application that "[t]he parcel layouts on the [Airport Layout Plan] are conceptual in that detailed design for each individual area will occur as specific projects are proposed," and the Airport included maps showing "typical" layouts and sections. The Airport acknowledged that these typical sections "are not meant to be inclusive of all potential projects." The Airport also included a map illustrating its currently planned projects within the permit area.

Alaska Statute 46.40.210 defines "consistency review" to mean "the evaluation of a proposed project against the standards adopted by the [Alaska Coastal Policy Council] under AS 46.40.040 and a district coastal management program approved by the council under AS 46.40.060."[7] ACE contends that a "project" must be specific before it can be reviewed for consistency. ACE notes that the legislature directed the Council to develop "policies and procedures to determine whether *specific proposals* for the land and water uses or activities subject to the district coastal program shall be allowed."[8] The Council approved an Office of Management and Budget regulation defining "project" to be

> an activity or use that will be located in or may affect the coastal zone . . . and that is subject to consistency review under 16 U.S.C. 1456(c), or that requires the issuance of at least one state permit; "project" includes each phase of a project when a land or water activity is developed or authorized in discrete phases.[9]

ACE asserts that this regulation and the Coastal Management Act "contemplate that the consistency review process will be invoked for a 'specific proposal' . . ., i.e., a proposed 'activity or use,' intended to be located in the coastal zone."

ACE charges that the Airport "did not propose a specific, ready-to-build project, but instead proposed a list of speculative someday possibilities" or "a vague, non-binding, speculative development plan." ACE argues

---

**6.** *Kachemak Bay*, 6 P.3d at 275 (noting that extent to which law allows dividing proposal into discrete parts and examining each part rather than whole for compliance is matter of statutory interpretation not involving agency expertise); *Miners Advocacy Council, Inc. v. State, Dep't of Envtl. Conservation*, 778 P.2d 1126, 1131–32 (Alaska 1989) ("Whether the federal Clean Water Act and [Department of Environmental Conservation] regulations require the state to certify [National Pollutant Discharge Elimination System] permits on an individual, site-specific basis or allow the state to issue a blanket certification covering many individual permits without performing site-specific evaluations is a question of law, which this court reviews under the 'substitution of judgment' standard."); *Matanuska–Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986) ("The independent judgment standard, under which the court makes its own inter-

pretation of the statute at issue, is applied where the agency's specialized knowledge and experience would not be particularly probative on the meaning of the statute.").

**7.** AS 46.40.210(3).

**8.** AS 46.40.040(1)(E) (emphasis added). Similarly, the Anchorage Wetlands Management Plan defines an individual § 404 permit as "a permit that may be issued following a case-by-case evaluation of a specific project involving the proposed discharge."

**9.** 6 AAC 50.990(22) (amended 2003). In the new amended version (not applicable to this case), "project" is defined at .990(30) to mean "all activities that will be part of a proposed development."

that the Airport's provision of only "a hypothetical development scenario and a virtually open-ended, 'summarized' list of projects" meant that the Division "could not identify, evaluate, and prohibit or mitigate effects since it could only speculate about what these effects might be." Specifically, ACE asserts that the State could not perform the required thorough review of a project and its effects to ensure compliance with the major use and activity standards codified at 6 AAC 80.040–.140 and that the Division therefore erred in considering the Airport's proposal.

The State counters that the information provided by the Airport was sufficient for public review. The State notes that the Airport submitted a 150–page application, including the coastal project questionnaire, the Corps application, and six appendices documenting "the historical and forecasted activities at the airport, the [Federal Aviation Administration (FAA)]-approved layout plan for the airport, the typical sections for proposed development, wetland assessments, the wetland debit/credit methodology, and the activities proposed within the permit area." The State asserts that the permit application addressed "the public need for the project, alternatives to development, the environmental impacts of the project and how those would be dealt with, and mitigation to make up for wetlands loss." The Division also had the benefit of information generated during years of collaborative permit planning and debate among the resource agencies, citizen groups, and the Airport.

Essentially, then, the question boils down to whether the Division of Governmental Coordination can consider a "project" to be a Corps permit authorizing dredge and fill activity to support categories of possible runway-dependent and other aviation-related uses (in other words, can the "project" be airport expansion as a whole), or whether the Division can consider only specific uses or activities that the airport will definitely pur-

sue that would be located on that fill as part of the airport expansion?

The Division described the "project" in its letter initiating the consistency review as "a 10–year permit from the U.S. Corps of Engineers to fill up to 5.8 million cubic yards of classified fill into .240 acres of wetlands." When responding to public comments that the Airport's proposal was not specific enough, the Division responded that "[t]his project is comparable to a general permit in which the permit details the allowable uses and the manner in which they are to be developed. The [Corps of Engineers's] Public Notice and information provided subsequent to the initial Public Notice provide[ ] adequate detail to conduct the ACMP review." [10] Similarly, the superior court held that a broad definition of "activity or use" should be applied to "project," relying on several of our oil and gas lease sale cases and arguing that an oil and gas lease sale is analogous to airport expansion because it is a very general "activity or use" encompassing a wide range of possible activities.

In *Trustees for Alaska v. State, Department of Natural Resources*, we held that an oil and gas lease sale constituted a "project" and thus required an ACMP consistency review because the sale involved leases, which counted as "permits" under the regulation defining "project." [11] Similarly, in *Ninilchik Traditional Council v. Noah*, we again explained that an oil and gas lease sale had to comply with the ACMP because "all '[u]ses and activities' conducted in the coastal zone by state agencies" must be consistent with ACMP standards. [12] In *Kachemak Bay Conservation Society v. State, Department of Natural Resources*, we upheld a consistency review that had been phased and quoted the Department's justification for phasing its review: "[i]n oil and gas leasing, it cannot be determined with any specificity or definition at the leasing stage if, where, when, how, or

---

10. *See also Alaska Ctr. for the Env't v. West*, 157 F.3d 680, 683–84 (9th Cir.1998) (upholding Corps's general permit authorizing "a broad range of potential activities"). When the Corps issued the permit to the Airport, it analogized to a permit for a subdivision or planned community development, where the general layout and impacts can be specified but the specific details are

determined later, subject to restrictions and to subsequent local planning or zoning reviews.

11. 795 P.2d 805, 811–12 (Alaska 1990).

12. 928 P.2d 1206, 1209 (Alaska 1996).

what kind of production might ultimately occur[ ] as the result of leasing. . . ." [13]

ACE contends that these cases did not address how much information is needed before an agency can initiate a thorough consistency review, but rather involved whether the ACMP applies at all or whether phasing of the review was permitted. However, as the superior court noted, if an activity is not a "project," it is not subject to an ACMP consistency determination,[14] so *Trustees for Alaska* and *Ninilchik* are relevant in declaring that the ACMP applies to a broad oil and gas lease sale "project." Further, since we addressed in *Kachemak Bay* the question whether a review of the oil and gas lease sale could be phased, that means that a "project" existed to be reviewed in that case. We thus have previously accepted reviews of oil and gas lease sale "projects," which have at least as much uncertainty concerning actual future development as does Anchorage International Airport's expansion proposal.

Given these cases and the volume of information the Airport submitted, we hold that the Airport's broad proposal for airport expansion was a "project" amenable to ACMP review.

**B. The Division Adequately Reviewed All Uses and Activities and Did Not Have To Phase Its Review.**

**1. Standard of review**

■ The two issues we address here are: (1) did the Coastal Management Act require the consistency review to consider each individual possible future use, activity, and permit that could be part of the airport expansion (in other words, everything on the Airport's non-exclusive lists of possible uses), and (2) did the Act require the Division to phase its review? Because these are questions of law and statutory interpretation and do not meaningfully implicate

agency expertise, we apply the "substitution of judgment" standard of review.[15]

**2. The Division reviewed all uses and activities for the broad project.**

In *Cook Inlet Keeper v. State*, we explained that "a consistency determination must encompass the entire project it covers" and should "comprehensively consider[ ] or finally determine[ ] the consistency of all permitted uses and activities included in the whole project at issue." [16] We determined that a consistency review should "specifically focus[ ] on the consistency of the activities encompassed by all necessary . . . project permits—those already issued and those still to be issued." [17]

■ Basing its argument on its view of the specificity required in a "project," ACE alleges that the Division did not identify all permits needed for each item on the Revised Uses list in the consistency determination, mentioning only the Corps permit and the certificate of reasonable assurance from the Department of Environmental Conservation, and ignoring the Airport building permit, Airport ground lease, and perhaps other resource agency permits that any private party using the filled bogs would need.[18] ACE therefore argues that the Division did not review all uses and activities that might occur in developing the bogs, did not focus separately on each use or activity on the non-exclusive lists, and did not identify where any particular facility on those lists would be located or what its effects would be. ACE thus contends that the Division "could not and did not evaluate the 'entire project' in the meaningful way that the ACMP requires."

The State counters ACE's assertions by arguing that the Division evaluated the probable effects of complete destruction of wetlands through intensive development of airport-related facilities, basing its evaluation on

---

**13.** 6 P.3d 270, 280, 294 (Alaska 2000). "Phasing" involves dividing a proposal into discrete parts . . . and examining each of these parts individually for compliance rather than examining the project as a whole." *Id.* at 274 n. 1.

**14.** AS 46.40.210(3).

**15.** *Hammond,* 726 P.2d at 175.

**16.** 46 P.3d 957, 963, 965 (Alaska 2002).

**17.** *Id.* at 965.

**18.** *See* 17 AAC 42.210, .280.

the limited uses it would allow in the bogs and employing a model of the mix of uses that would constitute intensive development.[19] The State maintains that the Division analyzed the overall and secondary effects that would result from this worst-case intensive development scenario, rather than analyzing individually the effects of each use. In other words, the State views the project holistically, as it is described in the consistency determination by the Division: "a 10–year permit from the U.S. Corps of Engineers to be issued to Anchorage International Airport (AIA) to fill up to 5.8 million cubic yards of classified fill into 240 acres of wetlands in Turnagain Bog and Postmark Bog."

As explained above, we agree that airport expansion as a whole is a valid "project," and it was the project before the Division for review. The Airport building permits, ground leases, and any other permits that private parties using the filled bogs might need are only for specific developments that might occur later in expansion, not for expansion as a whole. Similarly, ACE's focus on the Division's failure to specify the location or effects of any particular facility associated with one of the listed uses incorrectly presumes a high level of required specificity in the project the Division was evaluating.

■ Nevertheless, the reviewing agency must consider " 'the probable cumulative impact of all anticipated activities' " that will be part of the project.[20] The State asserts that the Division considered the effects of future leases and permits in the area by limiting the uses for which such permits could be issued, studying the cumulative impacts of those uses in an intensive development model, evaluating secondary effects on water, air, traffic, and noise related to those uses, imposing conditions to address unforeseen circumstances, and incorporating additional stipulations imposed by the Corps and the Department of Environmental Conservation. The State maintains that postponing review until each use in the project area was fully defined was not required and would be less comprehensive. The State notes that "[t]he elements of an airport, and the effects on people and the environment, are well-known and can be studied as a whole to allow comprehensive review." The State argues that adopting a holistic approach here is good policy and is within the discretion of the agency.

We agree. We have recognized the benefits of comprehensive evaluation of environmental risks, noting that "the more segmented an assessment of environmental hazards, the greater the risk that prior permits will compel [the agency] to approve later, environmentally unsound permits."[21] Limiting the types of development allowed on the filled lands and imposing conditions and stipulations address the cumulative impacts of possible future developments.[22] Given the broad "project" at issue here, we affirm the comprehensive approach taken by the Division.

### 3. The Division did not have to phase its review.

■ Contrary to ACE's assertions, the Division did not have to phase the review over time in accordance with AS 46.40.094. That statute authorizes the reviewing agency to limit its consistency review to the current phase of a project (1) if there is insufficient information at the time the project is initiated to render a consistency determination for the entire proposed use or activity, (2) if the project can proceed in discrete phases based on developing information obtained in the course of a phase, and (3) if each subsequent phase is subject to discretion to implement alternative decisions based on the developing information.[23] To phase its review,

---

19. This model explicitly states that it "is not a guarantee of what level of development will occur in each area. It is one of the many possible development scenarios that might occur."

20. *Trustees for Alaska v. State, Dep't of Natural Res.*, 851 P.2d 1340, 1344 n. 8 (Alaska 1993) (quoting *Trustees for Alaska v. Gorsuch*, 835 P.2d 1239, 1246 (Alaska 1992)).

21. *Id.* at 1344 (citing *Gorsuch*, 835 P.2d at 1246 n. 6).

22. For instance, one stipulation mandates public notice for any Airport lease proposal so as to ensure that the proposed use is consistent with the ten-year Corps permit.

23. AS 46.40.094(a).

the Division would have to condition its consistency determination so that future activities and uses would also have to be consistent with the ACMP, would have to expressly explain why it was phasing review, and would have to carry out a subsequent consistency review before later phases could proceed.[24]

ACE argues that leases or permits for specific activities or facilities in the permit area—whether from the Airport, from state resource agencies (such as state air pollution permits), or from federal agencies (such as federal oil spill contingency plan approvals)—will trigger the ACMP consistency review requirement again, and that the Division therefore violated AS 46.40.094 because it failed to reserve the state's right to undertake consistency reviews triggered by those permits.

The State responds that phasing was unnecessary. The State declares that the Division considered the impacts of the Corps permit and its resulting activities and approved the permit's issuance. As noted, under the permit, no fill or construction can proceed for any Airport lease proposal until the Division, other resource agencies, and the public receive notice and have a chance to review the proposed plan to ensure it is consistent with the Corps permit. The consistency determination declares that if the proposed use does not fall within what was previously authorized or if new permits subject to ACMP review are needed, the Division would then perform a subsequent review.

We agree that phasing is unnecessary here. The Division analyzed the effects of the worst-case intensive development model and placed conditions and stipulations—like those discussed above—on future uses and activities to ensure that those uses comply with the ACMP. To the extent those uses are not consistent, they would be subject to subsequent individual review. We therefore affirm the Division's decision not to phase its review and instead to limit future uses via conditions and stipulations.

## C. The Division Correctly Applied the Standards of the ACMP and the Anchorage Coastal Management Plan.

### 1. Standard of review

The Division's decision as to the applicability of the major energy facility standard, 6 AAC 80.070, involves an agency's interpretation of its own regulations. We review an agency's interpretation of its own regulation under the "reasonable basis" standard, "deferring to the interpretation unless it is 'plainly erroneous and inconsistent with the regulation.' " [25] Whether the Division correctly applied the ACMP statewide standards and the Anchorage Coastal Management Plan (Anchorage CMP) policies is also subject to review under the "reasonable basis" standard, under which we must confirm that the agency "has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making" and must verify that the agency has not failed to consider an important factor in making its decision.[26]

### 2. Major energy facility standard

"Major energy facility" is defined at 6 AAC 80.900(22) to include:

marine service bases and storage depots, pipelines and rights-of-way, drilling rigs and platforms, petroleum or coal separation, treatment, or storage facilities, liquid natural gas plants and terminals, oil terminals and other port development for the transfer of energy products, petrochemical plants, refineries and associated facilities, hydroelectric projects, other electric generating plants, transmission lines, uranium enrichment or nuclear fuel processing facilities, and geothermal facilities; "major energy facility" means a development of more than local concern carried out in, or in close proximity to, the coastal area,

---

**24.** AS 46.40.094(b)(1)(A), (1)(B), (3).

**25.** *Lauth v. State,* 12 P.3d 181, 184 (Alaska 2000) (quoting *Board of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin.,* 968 P.2d 86, 89 (Alaska 1998)).

**26.** *Trustees for Alaska v. State, Dep't of Natural Res.,* 795 P.2d 805, 809 (Alaska 1990) (quotations omitted).

which meets one or more of the following criteria:

(A) a facility required to support energy operations for exploration or production purposes;

(B) a facility used to produce, convert, process, or store energy resources or marketable products;

(C) a facility used to transfer, transport, import, or export energy resources or marketable products;

(D) a facility used for in-state energy use; or

(E) a facility used primarily for the manufacture, production, or assembly of equipment, machinery, products, or devices which are involved in any activity described in (A)-(D) of this paragraph[.]

The regulation requires that a coastal project involving major energy facilities meet various siting and other criteria where feasible and prudent.[27] The Division found that the major energy facility standard was inapplicable to the Airport's proposal. ACE alleges that the Division's failure to consider the major energy facility standard rendered the consistency determination arbitrary, as it failed to consider an important factor.[28]

**a.** **We defer to the Division's interpretation of the standard.**

ACE points out that the list of possible uses included in the Division's consistency determination included "fuel storage, transportation and dispensing" as a runway-dependent use and provision of "bulk fuel storage facilities"[29] as an aviation-related use and declares that "it is beyond question that [the Airport] is a 'development of more than

local concern' and that the fuel will be for in-state energy use." ACE contends that the State's argument in the superior court that the court should defer to the Division's interpretation of the standard so as to apply to "energy-related facilities, not to businesses that use fuel in daily operations" is faulty. ACE maintains that the Division's interpretation is inconsistent with the regulation's plain language and that the Division did not provide in the consistency determination or in the administrative record a reasoned justification for "reinterpreting the plain language definition of 'major energy facility.' "

The State counters that the Division developed the major energy facility standard in response to oil and gas development and that the Division therefore interprets the standard to apply to facilities that provide energy rather than developments that use energy incidentally. The State claims that ACE's definition would absurdly encompass any development of more than local concern that anywhere within it stored or used energy products of any amount, including a five-gallon propane tank.

ACE's argument concerning the Division's interpretation of the standard must fail. While it is possible that a plain-language reading of the definition of "major energy facility" could apply to the airport expansion since Anchorage International Airport is "a development of more than local concern" that will "store energy resources" for "in-state energy use," we have "rejected the plain meaning rule in favor of a rule wherein '[s]tatutory construction begins with an analysis of the language of the statute construed

27. 6 AAC 80.070(b).

28. *See Southeast Alaska Conservation Council, Inc. v. State,* 665 P.2d 544, 548–49 (Alaska 1983) ("Where an agency fails to consider an important factor in making its decision, the decision will be regarded as arbitrary.").

29. "Bulk fuel storage" was deleted from the final Corps permit. The State argues that this deletion, although after the Division's review, makes that particular activity functionally moot. ACE correctly responds that the State cites no authority for the proposition that the Corps permit, issued under federal law, somehow modifies the consistency determination issued under state law

so as to make ACE's challenge of the Division's review under the ACMP moot. ACE notes that the permit can always be modified to allow bulk fuel storage, 33 C.F.R. § 325.7(a)-(b), meaning that the issue could "recur and evade future review." *Cook Inlet Keeper,* 46 P.3d at 960 n. 11. In addition, "fuel storage, transportation, and dispensing" remained as a runway-dependent use. Furthermore, the superior court rejected this mootness claim and the State did not cross-appeal, so we decline to consider the issue. *See Kodiak Seafood Processors Ass'n v. State,* 900 P.2d 1191, 1195 n. 5 (Alaska 1995); *Andersen v. Edwards,* 625 P.2d 282, 285 (Alaska 1981).

in light of its purpose.' "[30] We have explained that "even when a statute's language meaning seems plain on its face, ambiguity may arise if applying that meaning would yield anomalous consequences," and that "because 'plain meaning' cannot exist in a vacuum, ambiguity is necessarily a creature of context."[31] We have therefore concluded that " '[w]hen a statute or regulation is part of a larger framework or regulatory scheme, even a seemingly unambiguous statute must be interpreted in light of the other portions of the regulatory whole.' "[32]

Reading the entire definition of "major energy facility" in 6 AAC 80.900(22) in conjunction with the siting criteria for such facilities in 6 AAC 80.070 and with the coastal project questionnaire lends much credence to the Division's interpretation. The siting criteria for major energy facilities includes considerations of "shipping routes," "spills," and "airborne emissions."[33] The coastal project questionnaire asks whether the applicant's project will "require or include onshore or offshore oil facilities with an effective aggregate storage capacity of greater than 5,000 barrels of crude oil or greater than 10,000 barrels of non-crude oil" (to which the Airport answered in the negative). The inclusion of the word "major" casts doubt on ACE's strict interpretation of the definition,

since, contrary to ACE's protestations, its interpretation could include a facility that has a five-gallon propane tank for "in-state energy use."[34] ACE's "literal reading . . . strains common sense."[35] At the least, the definition of "major energy facility" contains ambiguity, and "when the meaning . . . is ambiguous or in doubt, the [agency's] interpretation is entitled to great weight."[36] We therefore affirm the Division's interpretation of the major energy facility standard, as it is neither plainly erroneous nor inconsistent with the regulation.

### b. The Division's interpretation did not need to be adopted as a regulation under the Administrative Procedure Act.

ACE further maintains that the Office of Management and Budget has never adopted the Division's interpretation of the major energy facility standard as a regulation in accordance with the Alaska Administrative Procedure Act, AS 44.62.[37] The State argues that no additional regulation is needed to define "major energy facility."

"Whether the agency action is a regulation is a question of law that does not involve agency expertise," so we apply our independent judgment.[38] The Division's in-

30. *Bullock v. State, Dep't of Cmty. & Reg'l Affairs,* 19 P.3d 1209, 1214 (Alaska 2001) (quoting *Borg–Warner Corp. v. Avco Corp.,* 850 P.2d 628, 633 n. 12 (Alaska 1993)).

31. *Federal Deposit Ins. Corp. v. Laidlaw Transit, Inc.,* 21 P.3d 344, 351 (Alaska 2001).

32. *Id.* (quoting *Millman v. State,* 841 P.2d 190, 194 (Alaska App.1992)).

33. 6 AAC 80.070(b)(8), (11), (14).

34. Cf. *Ober v. Whitman,* 243 F.3d 1190, 1194–95 (9th Cir.2001) (allowing Environmental Protection Agency to exempt de minimis sources of pollution from Clean Air Act controls because statutory language did not prohibit it and because "[c]ourts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort").

35. *Federal Deposit Ins. Corp.,* 21 P.3d at 351.

36. *Bullock v. State, Dep't of Cmty. & Reg'l Affairs,* 19 P.3d 1209, 1215 (Alaska 2001) (internal quotations omitted).

37. AS 44.62.640(a)(3) defines "regulation" as:

every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency; . . . "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretive bulletins," "interpretations" and the like, that have the effect of rules, orders, regulations, or standards of general application, and this and similar phraseology may not be used to avoid or circumvent this chapter; whether a regulation, regardless of its name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public[.]

38. *Kachemak Bay Watch, Inc. v. Noah,* 935 P.2d 816, 821, 825 (Alaska 1997); *Jerrel v. State, Dep't of Natural Res.,* 999 P.2d 138, 141 (Alaska 2000).

terpretation of the standard does not satisfy the Administrative Procedure Act's definition of "regulation," as it was not an "amendment, supplement, or revision of a rule, regulation, order, or standard"[39] so much as it was a common sense interpretation of the regulation's applicability. It neither provided new requirements nor made the existing ones any more specific.[40] The Division's interpretation "was not an addition to a regulation involving requirements of substance. Instead, it was the interpretation of the regulation according to its own terms."[41] The Division's interpretation thus was not a "regulation" and did not need to be promulgated in accordance with the Alaska Administrative Procedure Act.

### 3. Coastal development and habitats standards

The coastal development standard directs agencies to prioritize development in coastal areas for water-dependent and water-related uses, placing third and last in the hierarchy "uses and activities which are neither water-dependent nor water-related for which there is no feasible and prudent inland alternative to meet the public need for the use or activity."[42] The Division concluded that the Airport's proposal was "neither water-dependent nor water-related" but that "no feasible and prudent inland alternative to meet the public need for the use or activity" exists.

The habitats standard similarly declares that agencies may allow uses and activities in coastal zone wetlands that would not "maintain or enhance the ... characteristics of the habitat" and that would not "assure adequate water flow, nutrients, and oxygen levels and avoid adverse effects on natural drainage patterns, the destruction of important habitat, and the discharge of toxic substances" if three conditions are met.[43] These three conditions are that "there is a significant public need for the proposed use or activity," that "there is no feasible prudent alternative to meet the public need for the proposed use or activity which would conform to [the above] standards," and that "all feasible and prudent steps to maximize conformance with the [above standards] will be taken."[44] These three conditions are "stringent" and "strongly protective."[45] The standard is meant to apply "a strict limitation on impacts to the point of prohibition" unless these conditions are met.[46] The Division determined that the Airport's project satisfied these three conditions. .

### a. Public need

A 1982 Informal Attorney General Opinion explained "public need" as follows: "[t]he proposed activity cannot merely be convenient, though it need not be indispensable. The need is not that of an individual or corporation, but that of the community or some larger element of the public (e.g., state or nation)."[47] The habitats standard imposes a "higher standard" than the coastal development standard, requiring "significant public need"; "[w]hile the distinction ... is necessarily somewhat subjective, factors such

---

39. AS 44.62.640(a)(3).

40. This distinguishes the present case from *Jerrel*, in which we held that a rule by the Department of Natural Resources requiring horses to be marked in a permanent manner that would be visible from twenty feet away was not an interpretation of the existing marking regulation but rather was a new substantive requirement that made that regulation more specific and thus a new regulation, necessitating compliance with the Administrative Procedure Act. 999 P.2d at 143, 144.

41. *Usibelli Coal Mine, Inc. v. State, Dep't of Natural Res.*, 921 P.2d 1134, 1149 n. 24 (Alaska 1996).

42. 6 AAC 80.040(a)(3).

43. 6 AAC 80.130(b)-(d).

44. *Id.*

45. *Trustees for Alaska v. State, Dep't of Natural Res.*, 851 P.2d 1340, 1344 (Alaska 1993).

46. *Kachemak Bay,* 6 P.3d at 288 n. 61 (quoting Office of Coastal Mgmt, State of Alaska & Office of Coastal Zone Mgmt., U.S. Dep't of Commerce, State of Alaska Coastal Management Program and Final Environmental Impact Statement 72 (1979) [hereinafter FEIS] (available at http://unicorn.csc.noaa.gov/docs/czic/TC224.A4_F5_1979/89A4FB.pdf)).

47. Meaning of "Public Need" As Used in ACMP Regulations, 1982 Informal Op. Att'y Gen. 953, 956.

as immediacy of the need and the potential for loss of life or harm to health could assist in the classification." [48]

■■■ Presumably because the showing needed for the habitats standard is greater, the Division addressed the "public need" criterion for both the coastal development and habitats standards in its discussion of the habitats standard. The Division referred to the Airport studies, specifically the "June 1999 AIA Master Plan Update in Chapter 3, Facility Requirements," indicating that "additional facilities will be needed for the airport to remain a viable commercial hub for the State of Alaska." [49] The Division declared that "[t]his is not the desire or need of a few individuals, rather it is meeting a statewide need. Moreover, it is not just a desire, but is a central part of the statewide transportation network and [it] is in the public interest to maintain a viable international airport and seaplane base in Anchorage." Because the Division identified a "significant public need for a functional international airport in Anchorage," it found this condition to be satisfied.

■■■ "The determination that a significant public need ... exists is exactly the type of 'policy decision, involving complex issues that are beyond this court's ability to decide,' to which we give considerable deference. Without evidence that this decision was arbitrary or capricious, we cannot negate this policy decision...." [50]

ACE claims that the Division failed to show public need, much less significant public need, for any particular use or activity on the consistency determination's list of possible uses. ACE maintains that the Division's statements in the consistency determination and the Airport's statement in its application that the "purpose of the project is to allow [the Airport] to meet the air transportation needs of Anchorage and Alaska and the development demands from current and future aviation operations" are merely "conclusory generalit[ies]" and do not show that a public need exists "for anything, much less everything, on the [r]evised [u]ses list."

ACE's arguments again stem from its view of the specificity needed for a "project." ACE's proposed methodology of separately explaining the need for each allowable use is an acceptable approach but is not the only or the required approach; addressing the development of uses in the aggregate is also allowable. In *Kachemak Bay Conservation Society*[51] and *Ninilchik Traditional Council v. Noah,*[52] we concluded that the agency reasonably determined that a significant public need existed for oil and gas lease sales because of the public need for revenues, jobs, and economic stability—benefits that stem from the project as a whole as opposed to individual uses or activities.[53] We therefore hold that the Division did not act arbitrarily or unreasonably in considering whether a "significant public need" existed for airport

**48.** *Id.* "While opinions of the attorney general are entitled to some deference, they are not controlling on matters of statutory interpretation." *Cissna v. Stout,* 931 P.2d 363, 368 (Alaska 1996).

**49.** ACE maintains that the Division erred in claiming that the Airport had conducted studies indicating a need for additional facilities if the airport was to remain a viable commercial hub for Alaska, because those "studies" were largely updated growth projections that did not identify particular facilities for which there is a public need. Chapter 3 of the Airport's Master Plan Update does indeed involve aviation demand forecasts, but it appears that the Division merely cited the wrong chapter, as Chapter 4 deals with facility requirements based on those projections. Furthermore, the Division cited the Airport's Update only as an example of these studies, not as the sum total of the studies conducted.

**50.** *Kachemak Bay,* 6 P.3d at 287–88 (quoting *Hammond v. N. Slope Borough,* 645 P.2d 750, 758–59 (Alaska 1982)).

**51.** 6 P.3d at 287–88.

**52.** 928 P.2d 1206, 1213 (Alaska 1996).

**53.** ACE responds that the revenue from the oil and gas lease sales in *Ninilchik* and *Kachemak Bay* was certain, whereas the Division never analyzed whether any use or activity on the Airport's list would generate a net revenue stream for the state. As noted above, however, in *Kachemak Bay* we quoted the Department of Natural Resources's justification for phasing its review, which noted that there is no certainty in oil and gas leasing: "[i]n oil and gas leasing, it cannot be determined with any specificity or definition at the leasing stage if, where, when, how, or what kind of production might ultimately occur[ ] as the result of leasing...." 6 P.3d at 280.

expansion as a whole, as opposed to for each particular potential use or activity.

■■■ ACE further asserts that neither the Division nor the Airport identified anything resembling a factor of immediacy or any threat of potential loss of life or harm to health that would indicate a "significant" public need to satisfy the habitats standard. These are not the only possible indicators, however; the attorney general's opinion clearly states that the difference between "public need" and "significant public need" is "somewhat subjective" and offered those two factors merely as ones that "could assist in the classification." [54]

As just noted, the public need we held to be reasonable in *Kachemak Bay* and *Ninilchik* included economic benefits such as jobs and revenue. Here, the Division pointed to the "statewide need" for Anchorage International Airport "to remain a viable commercial hub for the State of Alaska" and to the fact that the Airport "is a central part of the statewide transportation network." The Airport's critical role in the state was explained in its application, including the fact that it was responsible for one out of every ten jobs in Anchorage. The Division also had before it the Corps public notice of the Airport's permit application, which cited a study evaluating the economic impacts of the proposed wetland development and estimating that it could result in an additional 3,594 jobs in Anchorage. When reviewing the Airport's application for consistency with the Anchorage CMP, the Municipality's Department of Community Planning and Development commented that the Airport "has long demonstrated the tangible and secondary elements of public need for these airport improvements, specifically airport viability including fund generation for expansion, public health

and safety, and as a generator of economic impetus for the community." These economic, transportation, and other benefits could provide a reasonable basis for a finding of significant public need.

In responding to a citizen petition, the Municipality also noted that "the Anchorage [Coastal] District, along with the other agencies, spent a lot of time and energy validating the applicant's public need assertions." [55] The agencies' determination that a significant public need existed thus stemmed from a hard look. Given the "considerable deference" due the Division's determination of "significant public need" and the absence of any "evidence that this decision was arbitrary or capricious, we cannot negate this policy decision." [56]

#### b. Feasible and prudent alternatives

■■■ The regulations define "feasible and prudent" to mean "consistent with sound engineering practice and not causing environmental, social, or economic problems that outweigh the public benefit to be derived from compliance with the standard which is modified by the term 'feasible and prudent.' " [57] The final environmental impact statement prepared under the National Environmental Policy Act [58] for the ACMP indicates that the phrase "is used to describe situations when a normally applicable standard may be departed from, where forcing compliance with the standard would be impossible or cause a worse result than noncompliance." [59] The environmental impact statement further indicates that the Alaska Coastal Policy Council's intent was that " 'feasible and prudent' deviations from the normal standards should be narrow in inter-

---

54. Meaning of "Public Need" As Used in ACMP Regulations, 1982 Informal Op. Att'y Gen. 953, 956.

55. The Municipality of Anchorage is a "coastal resource district" since it is a "unified municipalit[y]" "that contains a portion of the coastal area of the state." AS 46.40.210(2).

56. *Kachemak Bay,* 6 P.3d at 287–88 (quoting *Hammond,* 645 P.2d at 758–59).

57. 6 AAC 80.900(20).

58. 42 U.S.C. §§ 4321–47 (1994); FEIS, *supra* note 46, at 1.

59. FEIS, *supra* note 46, at 79 (1979). The FEIS represents *a source of guidance, not binding authority.* We cited it in *Kachemak Bay,* 6 P.3d at 288 n. 61, and in *Ninilchik,* 928 P.2d at 1211 n. 8, as clarifying the purpose of the ACMP.

pretation and result only where the <u>public</u> good outweighs the <u>public</u> costs."[60]

In addressing the habitats standard, the Division stated only that "[t]he lack of feasible and prudent alternatives to construct aviation-related development is addressed under the statewide Coastal Development Standard (6 AAC 80.040)."[61] In that discussion, the Division declared that the proposal's "extensive analysis" indicating a lack of alternatives led to the Airport's decision to seek a long-term permit to accommodate growth, noting that the Anchorage Wetlands Management Plan acknowledged a lack of alternatives and included filling of these wetlands as acceptable for airport-related activities. The Division asserted that alternative airport locations outside Anchorage would also be in the coastal zone and faced costs and constraints that brought their feasibility into question, that expanding onto the Air National Guard's area was not feasible because the Guard is still using it and probably will be for many years, and that expanding into the West Air Park area was not feasible because the area has "significant site constraints" that led a prior attempt at development there to fail. The Division also observed that "[a]lternatives for aviation-related support facilities off airport lands are constrained by the need for proximity to the airfield to avoid departure delays and to keep aircraft servicing equipment that is not licensed for operation on public roadways off the roads." The Division further noted that Anchorage International Airport "provides the only general float plane facility in the Anchorage area. At present there is no feasible alternative for float or ski-based general aviation."

ACE argues that the Division erred in treating "all uses and activities on the [r]evised [u]ses list as if they were functionally equivalent," allowing the Division to conclude that these wetlands were the only feasible and prudent alternative location for every single use listed. As with public need, therefore, ACE contends that the Division failed to address feasible and prudent alternatives for any and every particular use or activity. This argument again relies on ACE's view of the required specificity of a "project," and we again conclude that the Division did not act arbitrarily in considering whether feasible and prudent alternatives to the wetlands existed for airport expansion as a whole (with consideration of the likely mix of future uses), rather than whether alternatives existed for each individual use.

Furthermore, the agencies did in fact consider whether alternatives existed for the individual uses, narrowing the list of allowable uses in the area to those that could not reasonably be located elsewhere. The Department of Fish and Game, for instance, concluded that many of the "Uses with Special Conditions" included in the Airport's application would not meet the habitats or coastal development standards if placed in wetlands because they "do not require ... placement within the immediate airport vicinity and the applicant has not shown whether feasible and prudent inland alternatives exist." This paring down of uses indicates that the Division of Governmental Coordination and the other agencies took a hard look at which uses had feasible and prudent alternatives and limited the allowable uses accordingly.[62]

ACE asserts that the Division did not establish that other approaches or locations, particularly West Air Park, did not present feasible and prudent alternatives to destroying wetlands. However, the Airport's Master Plan Update acknowledged that West Air Park would eventually become the next runway, and this limitation is also repeated in

---

60. FEIS, *supra* note 46, at 537 (underlining in original).

61. ACE argues that construction is not at issue, but rather whether "there is no feasible and prudent alternative ... for the proposed use or activity...." 6 AAC 80.130(d)(2). This is a pointless argument. Airport expansion will require construction in order for any dredge and fill activity to occur and for any of the permitted uses on the Revised Uses list to come into being.

62. *See Kachemak Bay,* 6 P.3d at 288 ("Examination of the record reveals that DNR's decision that there were no prudent and feasible alternatives to Sale 85A was not arbitrary nor capricious. In fact, as DNR points out, the sale area was pared down by 40,000 acres in direct response to concerns of residents of Homer. This indicates that DNR took the requisite 'hard look' at the sale area before issuing its consistency determination.").

the alternatives analysis in the Airport's permit application and in the Airport's 1995 Wetlands Alternatives Analysis, both of which clearly explained the numerous deficiencies of the West Air Park site and several other sites both within and outside Anchorage International Airport's grounds.

ACE also claims that "all non-runway dependent uses" could be located outside the wetlands, pointing to the Airport's concession in its Wetlands Alternatives Analysis Land Use Policy Paper that "[b]y their nature, any [aviation or aviation-related commercial or support] land use that does not need direct access to the airfield could, if absolutely necessary, be located off the airport." That paper, however, continued by noting that these uses benefit from being on the airport, increase operational efficiency, and improve service to airport users. The Airport's permit application alternatives analysis further establishes that the aviation-related facilities were most effective and efficient if located close to the existing airport infrastructure, that not enough vacant industrial-zoned land exists in Anchorage to support all the aviation-related activities, that "[t]o the extent activities could theoretically be moved to other locations in Anchorage, new problems would arise, such as increased traffic to and from the airport and development in other neighborhoods," and that moving activities away from the airport would create operational inefficiencies that could harm Anchorage International Airport's competitiveness and thereby risk jobs and revenues.

ACE also faults the Division for "impl[ying] that the requisite alternatives finding had already been made for all [the Airport's] proposed uses and activities, *en masse*, and that this finding is in" the Anchorage Wetlands Management Plan, which identified the Airport's lands as "sites where fill might be required for which there are no other local practicable locations" and stated that permits for these sites "should be entertained" subject to guidelines and Clean Water Act regulations. However, the Division did not defer to the Municipality's determination; the Division merely noted as *one* of the bases for its decision that the Anchorage Wetlands Management Plan "acknowledges a lack of alternatives."

As an additional matter, ACE takes issue with the Division's treatment of the Anchorage CMP policy to discourage development in Preservation Wetlands except where it would not be contrary to the public interest and "where no alternative areas exist." ACE notes that this is stricter than the "no feasible and prudent alternative" language in the statewide standards, and yet the Division stated that "[p]ublic interest and lack of alternatives were established previously" when addressing the habitats and coastal development standards. But the Municipality's consistency review of the Airport's proposal found that "[w]ith the site-specific guidelines and specific runway dependent/airport-related land uses outlined by the applicant in the 10-year application, wetland fills are specifically tied to only those activities for which there are no practical alternatives" and for which "[s]pecific and viable alternatives ... either do not exist or are impractical." The Municipality observed that "[l]and uses for which there are practical alternatives to the subject fill areas are specifically limited by the language in this permit." The Division is entitled to give substantial deference to the Municipality's assessments and can use them as one of the bases of its own conclusions, since the Municipality " 'is considered to have expertise in the interpretation and application of its program.' " [63]

In summary, the Division had a sizeable accumulated record of information before it that provided substantial support to the lack of alternatives for airport expansion, and the multi-year, multi-agency process of narrowing the list of uses that had no alternatives indicates that the agencies took a hard look at the existence of alternatives and genuinely engaged in reasoned decision-making. We therefore conclude that the Division had a reasonable basis for its conclusion that no feasible and prudent alternatives existed for the Airport's project.

### c. Maximize conformance

 Under the habitats standard, wetlands must be managed "so as to maintain or

---

**63.** *Ninilchik,* 928 P.2d at 1215 (quoting 6 AAC 50.120(a)).

enhance the biological, physical, and chemical characteristics of the habitat" and "so as to . . . avoid adverse effects on natural drainage patterns, the destruction of important habitat, and the discharge of toxic substances."[64] To allow use of the wetlands, the Division had to show that "all feasible and prudent steps to maximize conformance with [these managerial standards] will be taken."[65]

The Division determined that the Airport's proposal maximized conformance with the habitats standard. The Division noted that: (1) the only permissible activities would be those dependent on proximity to the runway; (2) mitigating measures incorporated into the permit would attempt to maintain the wetlands' hydrologic functions; (3) permit conditions place further restraints on fill activity by limiting allowable activities, requiring best-management practices, and placing timing restrictions on fill activities; (4) the Department of Fish and Game imposed a timing restriction to reduce impacts to nesting birds; (5) the permit requires the Airport to continue monitoring groundwater levels and to submit reports of fill activity so that the state can ensure that hydrologic functions are maintained and development is tracked; (6) meetings with state and federal agencies must occur before construction can commence, unless specifically waived by the agency; (7) stipulations require non-disturbance setbacks around ponds and buffers around developments to minimize disturbance of wildlife and habitats; (8) stipulations require additional public notice for any Airport lease proposal to ensure consistency of new wetland fill or clearing activity with the permit; (9) stipulations require screening landscaping for wetland fill projects abutting uncovered wetlands to ameliorate habitat impacts and disturbance; (10) the lost habitat and ecological values will be compensated for via offsite mitigation (in Klatt Bog), as required by the FAA; and (11) the habitat value of Turnagain and Postmark Bogs is already compromised because the FAA requires the Airport to actively haze birds and wildlife frequenting the areas to prevent them from posing hazards to planes.

In addition, the Division noted that

[t]o avoid adverse effects on natural drainage patterns, the [Airport] provided a hydrologic analysis that provides the best estimate of how water circulates through the Turnagain Bog wetlands. The [Airport] 10–year permit will require discontinuous development cells between each filled lot to ensure flow patterns are not altered. [The Airport] is required to monitor affected wetlands. The permit is subject to modification if new information indicates unacceptable hydrological effects.

The Department of Environmental Conservation also required its approval of a facility's storm/runoff water collection and treatment system design plan before any fill placement at that facility's site could occur. Furthermore, the Division had before it the conditions that the Corps would impose with the permit, including conditions for maintaining Turnagain Bog's hydrologic pattern and for controlling the order of development to protect wetlands should full build-out not occur; the Airport incorporated these conditions into its description of the project.

ACE argues that the Division erred in declaring that only activities dependent on runway proximity would be permissible, since only one of the Revised Uses list's categories consists of runway-dependent uses, with the other category being for aviation and aviation-related commercial and support uses. ACE is correct. It is likely that the Division meant to say something like "proximity to the airport" instead of "proximity to the runway." ACE also maintains that nothing in the text of the "maximize conformance" factor indicates that it can be satisfied by offsite mitigation. This may be, but at the same time, nothing in the factor indicates that offsite mitigation cannot be one of several "feasible and prudent steps" to preserve habitat. ACE further asserts that even if the FAA could override 6 AAC 80.130(d)(3) to force destruction of wetlands, the FAA's guidance on hazing birds and wildlife frequenting airport areas discourages only the creation of wildlife hazards, such as by siting landfills or other attractants too close to

---

64. 6 AAC 80.130(b), (c)(3).

65. 6 AAC 80.130(d)(3).

airports, but not the preservation of existing wetlands. The FAA, however, recommends that airport expansions that result in unavoidable wetlands disturbances may require mitigation off-site so as not to create a wildlife hazard.

ACE thus picks out for criticism small parts of the Division's rationale and claims that these challenges show that "in finding maximum conformance [the Division] relied on a false premise." Only the first of these small criticisms appears to be accurate, however, and taken together, ACE's challenges still leave the vast majority of the Division's rationale intact.

ACE further argues that this criterion of maximizing conformance was not applied for each use and activity on the Airport's list of possible uses. Again, this argument relies on ACE's view of the specificity required in a "project," and we again conclude that the Division did not act arbitrarily in considering airport expansion as a whole (with consideration of the likely mix of future uses), rather than whether the permit maximized conformance for each individual use. Given the numerous conditions and stipulations the Division cited in making its determination, we conclude that the Division took a hard look at the maximizing conformance factor and had a reasonable basis for its decision.[66]

Since the Division therefore took a hard look at all three conditions and had a reasonable basis for concluding that they were satisfied, we hold that the Division did not act arbitrarily in finding the Airport's project to be consistent with the habitats and coastal development standards.

### 4. Geophysical hazards standard and corresponding Anchorage Coastal Management Plan standard

#### a. Geophysical hazards standard

Portions of the area subject to the Airport's permit are in the "high/very high"

earthquake hazard zone.[67] Under the geophysical hazard areas standard, development in geophysical hazard areas "may not be approved by the appropriate state or local authority until siting, design, and construction measures for minimizing property damage and protecting against loss of life have been provided."[68]

In its discussion of this standard, the Division stated that any facilities located in the filled wetlands would have the siting, design, and construction measures to minimize property damage and protect against loss of life implemented through the Anchorage CMP requirement that construction activities comply with the Uniform Building Code (UBC), since building permits will be necessary before construction can begin in the filled wetlands and since the Anchorage Public Works Department reviews all tenants' building permits and applies the UBC requirements for building in high hazard areas. The Division explained that "uses authorized by the permit tend to be low-density human uses and with the design and construction measures described above, minimization of property damage and protection against loss of life has been provided."

ACE maintains that the Division's evaluation of this standard was in error because the final environmental impact statement for the ACMP states that

[s]ince it will be impossible for districts to thoroughly assess each hazard area and devise detailed standards covering any conceivable use, developers will be obligated to conduct the surveys and studies needed to determine exactly what siting, design and construction measures are needed. The districts and state agencies will have enough general data to know when to require such surveys from the

---

66. *See Ninilchik,* 928 P.2d at 1215 ("It is clear from the detailed and particular nature of these stipulations that DNR took a 'hard look' at the feasible and prudent steps necessary to minimize the impact of the Sale on the habitat. Therefore, we hold that DNR's analysis demonstrates a reasonable basis for its finding that all feasible and prudent steps to maximize conformance with the habitats standard have been taken.").

67. Oddly, the Airport answered "no" on the coastal project questionnaire to the question concerning whether the proposed project is "located within a known geophysical hazard area."

68. 6 AAC 80.050(b).

developers.[69]

ACE charges that the Division issued its consistency determination without any surveys or studies from the Airport on the siting, design, and construction measures needed to minimize harm to property and people and that without this data, the Division could not apply the standard correctly. Since the Division had no data, ACE contends, no deference is due to the Division's finding on the standard.[70]

■ The State argues that the Municipality adopted as a control measure in the Anchorage CMP the UBC sections dealing with construction in hazard areas, along with other measures and variations for local hazards. The State thus contends that the Division addressed the hazards by similarly requiring compliance with the local building code, as well as by requiring the use of a central sewerage system, engineering specifications to mitigate potential damage, and precautions during design and construction to reduce the hazard's effects—all Anchorage CMP policies. We conclude that the Anchorage CMP provided enough data on control measures for the Division to make its evaluation without further studies from the Airport.

■ ACE contends that the Division also erred by relying on the UBC requirements. ACE charges that the Division improperly deferred a "careful and detailed look" at siting, design, and construction measures "to later stages of the development process," quoting this court's decision in *Trustees for Alaska v. State, Department of Natural Resources.*[71] What we declared in that case, however, was that "deferring a careful and detailed look *at particularized geophysical hazards* to later stages of the development process ... entails certain practical risks."[72] We determined that identifying hazards on a lease-site-by-lease-site basis could "mask ap-

preciation of any cumulative environmental threat that would otherwise be apparent if DNR began with a detailed and comprehensive identification of those hazards."[73]

The logic of the *Trustees* holding does not necessarily extend to control measures, however, making ACE's substitution of "siting, design, and construction measures" for "particularized geophysical hazards" potentially inaccurate. In contrast to *Trustees,* the geophysical hazards here and the threat they pose appear to be relatively well understood, as evidenced by a map in the Anchorage CMP and a map from the Coastal Resource Atlas showing geophysical hazard areas within and near the airport.[74] With the threats generally understood, the "risks" of applying specific control measures later in the process are not great. Looking at the broad scope of the project, the Division prescribed standards that would be triggered later in the development process by means of the Anchorage CMP for specific facilities. The Division did not defer a hard look at this requirement, nor did it avoid its "duty of performing a pre-decisional analysis of the Geophysical Hazards Standard's application ... by placing the decision in the hands of the Municipality to be made after the consistency determination was rendered." Rather, it ensured that the requirement would be met during future development via application of the Anchorage CMP.

■ ACE further alleges that the UBC involves only design and construction, not the siting of facilities. The State responds that the issue of "siting" within the 240–acre site will be addressed by requiring appropriate design and construction to minimize damage, but ACE counters that no approval of development is allowed under the geophysical hazards standard until siting measures have been provided, meaning that siting measures

**69.** FEIS, *supra* note 46, at 59.

**70.** *See Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency,* 966 F.2d 1292, 1306 (9th Cir.1992) ("Without data supporting the expanded exemption, we owe no deference to EPA's line-drawing.").

**71.** 851 P.2d 1340, 1344 (Alaska 1993).

**72.** *Id.* at 1344 (emphasis added).

**73.** *Id.*

**74.** The Anchorage CMP map depicting hazard areas is meant to be "a general guide and not an accurate depiction of the individual" resource policy units, but the Coastal Resource Atlas map provides "[m]ore specific information."

cannot be provided after the consistency determination. The State's argument is correct, however. For earthquake design, the UBC provides that "[t]he procedures and the limitations for the design of structures shall be determined considering seismic zoning, site characteristics, occupancy, configuration, structural system and height"; specifically, the UBC directs that "[s]eismic hazard characteristics for the site shall be established based on the seismic zone and proximity of the site to active seismic sources, site soil profile characteristics and the structure's importance factor." [75] The UBC thus does factor "siting" into its design and construction standards for geophysical hazard areas. The Division therefore provided for siting measures in its consistency determination.

■■■ ACE further claims that the Division failed to discuss whether the UBC requirements "actually contain measures that are ... sufficiently protective against geophysical hazards in very high hazard areas," making it impossible to determine whether the standard was met. [76] However, the Division specifically referred to "the specific UBC requirements for building in 'high/very high hazard' areas." The UBC provides "highly technical" structural design and construction requirements for seismic zones, [77] which the Municipality and the Anchorage CMP rely upon as a control measure for hazardous lands. [78] The Division did not act unreasonably or arbitrarily in determining that the UBC standards were sufficiently protective.

■■■ ACE disputes the applicability of the UBC to Anchorage International Airport's expansion, pointing to the State's assertion (in response to the Division's draft consistency finding) that the Airport "has no authority to submit to [the Municipality of Anchorage] approval of land use decisions or development on AIA. The State Attorney General has issued an opinion that AIA is not subject to [Municipality] land laws and [the Department of Transportation] has directed AIA to comply with the AG opinion." ACE reasons that the Division could not therefore rely on the UBC to provide the protections that the geophysical hazards standard mandates. The State counters ACE's argument by correctly noting that Anchorage International Airport's separate planning and zoning statutes do not exempt the airport from local building codes. [79] The State also points to AS 35.10.025, which dictates that "[a] public building shall be built in accordance with applicable local building codes including the obtaining of required permits. This section applies to all buildings of the state and corporate authorities of the state." [80] These statutes indicate that the Airport is subject to Municipality building codes.

The State's most persuasive argument, however, is that the UBC applies to the airport expansion because that is a condition of the permit. ACE counters by noting that the Corps permit requires evidence of either a Municipality building permit, a fill permit, or listing in an annual report as a State-sponsored project. While this is true, the Division's consistency determination explicitly states that "[n]o filling for a structure is allowed prior to the tenant's receipt of a building permit from the Municipality of Anchorage." The Division also noted that "[b]uilding permits are necessary before tenants are authorized under the [Airport] 10-year permit to place fill in the Turnagain Bog wetlands. Fill may be placed without a building permit in the Postmark Drive por-

---

**75.** 1997 Uniform Building Code, Vol. 2, §§ 1629.1, 1629.4, at 2–11.

**76.** *See Hammond,* 645 P.2d at 762 n. 7 ("In order for a court to review the consistency 'finding' of the Commissioner required by the ACMP, the Commissioner must at a minimum establish a record which reflects the basis for his decision.").

**77.** 1997 Uniform Building Code, Vols. 2 & 3, §§ 1626–35, 1654–65, 1809, 1921, 2210–14, 2220.

**78.** Anchorage Municipal Code (AMC) 23.05.010.

**79.** AS 35.10.025; 1996 Inf. Op. Atty. Gen. (October 24, 1996; 661–97–0228) (aviation zoning).

**80.** AS 35.95.100(6) defines "public building" as "a building owned or controlled and held by the state for government or public use."

tion of the permit; however, a building permit still is needed before construction of any facility can begin." The consistency determination

represents a consensus reached between you as the project applicant and the reviewing agencies listed above, regarding the conditions necessary to ensure the proposed project is consistent with the ACMP. We are informing the federal agency responsible for approving a federal authorization for your project that your original proposal has been modified subject to the conditions in this consistency determination.

Given the statutory language and the conditions in the Division's consistency determination, we conclude that the UBC applies to Anchorage International Airport's expansion.

### b. Anchorage CMP hazardous lands policy

■ In addition to the geophysical hazards standard, ACE also challenges the Division's finding of consistency with the Anchorage CMP policy for hazardous lands. The "values" listed in the Anchorage CMP for these lands include open space, recreation, parks, greenbelts, aesthetics, development where feasible and safe, and development when no other alternative area exists. The "policies" associated with these lands are as follows:

1. Discourage development in areas designated "high hazard."

2. Encourage the Municipality to adopt adequate regulations and ordinances in these areas.

3. Require the use of central sewerage systems and engineering specifications sufficient to mitigate potential loss of life and property.

4. Assure that all appropriate precautions are taken during design, construction, and landscape modification to reduce the effects of the hazard.

The Division declared that "[d]evelopment in these areas is not prohibited and the State of Alaska and the [Municipality] believe [the Airport] has demonstrated practicable alternative sites are not available," and then referred to its discussion of the geophysical hazards standard.

Federal regulations applicable to state plans require the project applicant to show consistency with the "enforceable, mandatory policies of the management program" and to "demonstrate adequate consideration of policies which are in the nature of recommendations." [81] ACE claims that the Division's decision was arbitrary because the Division never discussed how the Airport's proposal would protect the "values" listed above, nor how the Airport's project would meet the policy of discouraging development in high hazard areas. ACE contends that "values" are the building blocks for the "policies," so they provide direction for management, yet instead of showing that "no other alternative area exists," the Division only claimed that the Airport "has demonstrated that practicable alternative sites are not available," which, according to ACE, is more lenient.

The federal regulation ACE cites lists the information a project applicant must provide, not what a reviewing agency must do. Alaska regulations define the ACMP to include "the enforceable policies of approved programs of districts" and direct that a project is "consistent" when it is "in compliance with . . . the enforceable policies of an approved program for an affected coastal resource district." [82] The enforceable elements of the Anchorage CMP for hazardous lands are the "policies," not the "values." The consistency review addresses the relevant policies, noting that a central sewerage system will be required and that the UBC standards assure that appropriate precautions are in place to minimize the hazard. Although one of the policies is to discourage development in high hazard areas, the Division was correct in noting that development in these areas is not prohibited, as is clear from the term "discourage" and the stated goal of assuring "that development in areas designated as hazardous lands occurs in a manner consistent with [the geophysical hazards standard]

81. 15 C.F.R. § 930.58(a)(4) (2000).

82. 6 AAC 50.990(a)(1), (8) (repealed 2003).

in order to protect human life and ensure public safety and welfare."

Assuming that the "values" can be considered "policies which are in the nature of recommendations," the Division and the Airport demonstrated adequate consideration of them. The Division specifically addressed recreation, the feasibility and safety of development, and the lack of alternatives in its consistency determination. The Airport also removed part of Connors Bog from the permit application and rejected other Airport lands as expansion possibilities due to public concern about their use as recreation areas, and it considered aesthetics and open space in proposing a 300–foot buffer along the airport's east boundary to provide noise and visual mitigation. Also, as noted earlier, the Municipality in conducting its consistency review noted that "the Municipality and the resource agencies have acknowledged the airport's need for expansion and the fact that there are no alternatives other than within the airport boundary to accomplish these needs," and that "[s]pecific and viable alternatives for all of the runway dependent/airport related land uses spelled out in this application either do not exist or are impractical." Reviewing agencies give substantial deference to and can use as a basis for their own conclusions the assessments of the affected district, which " 'is considered to have expertise in the interpretation and application of its program.' " [83]

The Division thus had a reasonable basis for concluding that the Airport's project was consistent with the Anchorage CMP's enforceable policies, and the Division and the Airport showed adequate consideration of the Anchorage CMP's "values" associated with hazardous lands.

We therefore conclude that the Division reasonably and not arbitrarily determined that both the geophysical hazards standard and the Anchorage CMP policies were met.

### 5. Transportation and utilities standard

The transportation and utilities standard dictates that "[t]ransportation and utility routes and facilities in the coastal area must be sited, designed, and constructed so as to be compatible with district programs." [84] The Division noted the Municipality's determination "that the proposed uses and associated safeguards would allow development of the transportation facilities in a manner that is compatible with the [Anchorage] CMP."

ACE charges that although deference is due the Municipality's opinion, the Division erred in completely deferring to the Municipality because the Division still had a duty to independently determine consistency. [85] In *Ninilchik*, we stated that despite the deference due to districts in interpreting their own coastal management programs, "[t]his deference does not ... relieve [the reviewing agency] of the duty to independently determine that the [project] is consistent with the affected [programs]." [86]

The State responds by claiming that the local coastal district does not have specific standards to review for consistency with this standard and that instead, the district reviews the program as a whole and so transportation and utility routes were reviewed in the context of the project as a whole. Specifically, the State contends that the Division considered the transportation and utilities standard through its "consideration of whether the project was consistent with the coastal development, geophysical hazard, habitats, air, land and water quality standards and related coastal district policies."

ACE counters that there is a "specific standard" for review of the transportation

**83.** *Ninilchik*, 928 P.2d at 1215 (quoting 6 AAC 50.120(a)).

**84.** 6 AAC 80.080(a).

**85.** ACE argues that such deference was "particularly inappropriate" since the Municipality had no specific information about the siting, design, or construction of any particular facility on the Revised Uses list when it made its compatibility determination. Again, as discussed numerous times previously, this argument fails because it relies on a different conception of the specificity required in the "project."

**86.** *Ninilchik*, 928 P.2d at 1215.

and utilities standard, since the Anchorage CMP's policies for coastal wetlands and preservation freshwater wetlands include a policy to "[a]void or minimize, any identified adverse impacts to coastal or freshwater marshes and wetlands (as identified in Anchorage [Wetlands Management Plan]) from public works activities such as transportation projects and utility, sewer and drainage activities." ACE charges that since the Division did not discuss this policy, its decision is arbitrary.

ACE is correct in identifying the existence and applicability of this policy, but the State is correct in arguing that the Division established that the policy was satisfied in its discussions of other standards. The Division explicitly addressed the Anchorage CMP policies for coastal and preservation wetlands, noting that

> [f]eatures of the permit that ensure the wetland values are assessed appropriately and necessary protection is incorporated into the project have been discussed previously under "A" and "B" Wetlands policies of the [Anchorage Wetlands Management Plan] and the Development, Habitats, and Air, Land, and Water Quality statewide standards of the ACMP.

These analyses addressed the concerns about minimizing adverse impacts to wetlands. The Division noted the numerous conditions and stipulations designed to maximize conformance with the requirements of the habitats standard and the air, land, and water quality standard to maintain habitat characteristics and protect water quality and patterns. The Division also discussed the measures taken to meet the policies for various types of wetlands under the Anchorage Wetlands Management Plan, specifically mentioning the Plan's explicit acknowledgment that use of Airport wetlands for airport-dependent activities is allowable due to the lack of practicable alternatives.

The Division thus took a hard look at the Anchorage CMP's policies, even if it failed to mention them explicitly in its discussion of the transportation and utilities standard. Accordingly, we conclude that the Division had a reasonable basis for finding that standard to be satisfied.

## IV. CONCLUSION

The Division of Governmental Coordination was entitled to view the Airport's project holistically instead of in a piecemeal manner. The numerous conditions and stipulations imposed by various agencies ensured that all uses, activities, and permits were considered, so phasing was unnecessary. The Division's interpretation of its major energy facility regulation was neither erroneous nor inconsistent with the regulation and did not need to be promulgated as a regulation under the Alaska Administrative Procedure Act. The Division took a hard look at the various statewide and municipal standards, genuinely engaged in reasoned decision-making, and did not fail to consider any important factors.

We therefore AFFIRM the Division's consistency review and consistency determination in all respects.